UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

_____
                                          )
In re:                                    )
                                          )
JOHN D. GESSIN              CH: 7 )    11-51818-btb
                                          )
RISSONE v. GESSIN                         )    11-05077-btb
                                          )
TRIAL RE: DOC# 1 ADVERSARY CASE           )
11-05077, COMPLAINT FILED BY STACEY       )
RISSONE vs. JOHN D. GESSIN FEE AMOUNT     )
$250                                      )
_____ )

                          U.S. Bankruptcy Court
                          300 Booth Street
                          Reno, NV 89509-1300

                          May 7, 2012
                          1:43 p.m.

            BEFORE THE HONORABLE BRUCE T. BEESLEY, Judge

APPEARANCES:

For the Stacey Rissone:      Glade L. Hall
                             HUTCHISON & STEFFEN
                             105 Mt. Rose Street
                             Reno, NV 89509

For the Debtor:              Shelly T. O'Neill
                             DEMETRAS & O'NEILL
                             230 East Liberty Street
                             Reno, NV 89501

Proceedings recorded by electronic sound technician Stacie C.
Kief; transcript produced by AVTranz.

**AVTranz**
www.avtranz.com · (800) 257-0885

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **WITNESSES:** | | | | |
| | | | | |
| Stacey Rissone | | | | |
| (By Mr. Hall) | 4 | | | |
| [Voir Dire by Ms. O'Neill] | 10 | | | |
| (By Mr. Hall - Resumed) | 15 | | | |
| (By Ms. O'Neill) | | 28 | | |
| (By Mr. Hall) | | | 84 | |
| (By Ms. O'Neill) | | | | 85 |
| | | | | |
| Allison Taitano | | | | |
| (By Mr. Hall) | 88 | | | |
| (By Ms. O'Neill) | | 92 | | |

| | Offered | Received |
|---|---|---|
| **EXHIBITS:** | | |
| | | |
| 1 | 10 | 15 |
| 3 | 21 | 22 |
| 25 and 26 | 75 | 76 |

1          THE COURT:  This is John D. Gessin,      11-51818,

2     Adversary Number 11-05077.  Appearances please.

3          MR. HALL:  Glade Hall appearing on behalf of the

4     Plaintiff, Stacey Rissone, Your Honor.

5          MS. O'NEILL:  Shelly O'Neill on behalf of the Debtor,

6     Mr. Gessin, Your Honor.

7          THE COURT:  And who are the various people sitting

8     behind you?

9          MS. O'NEILL:  Your Honor, I think it looks like

10    friends of the bride, friends of the groom.  The People all

11    behind me would be defense witnesses that are listed in my

12    trial statement.

13         THE COURT:  Mr. Hall?

14         MR. HALL:  Yes.  We only have two witnesses, Your

15    Honor, but we would like to invoke the rule of exclusion.

16         THE COURT:  The rule of exclusion's been invoked.

17    Anybody who is going to be a witness needs to leave the

18    courtroom now and come back in when you're called.  You're also

19    not to discuss the testimony of other witnesses with either of

20    the attorney or with those witnesses prior to the conclusion of

21    your testimony.  So if you're going to be a witness, please go

22    out in the hallway.

23         MS. O'NEILL:  Your Honor, could we swear everyone

24    now?

25         THE COURT:  Sure.

RISSONE - DIRECT

1          MS. O'NEILL:  That might save -- I know that we're

2    going to try to get this done as quickly as possible this

3    afternoon.  Perhaps if we swear everyone in now --

4          THE COURT:  Anybody who's going to be a witness,

5    please stand and be sworn.

6          THE CLERK:  Please raise your right hand.

7                         WITNESSES SWORN

8          THE COURT:  Okay.  Okay.  So if you're not a party to

9    the action and you're going to be a witness, please go into the

10   hallway.  Please don't listen at the door and as I said do not

11   talk to anybody about their testimony or other person's

12   testimony.

13         Do people want opening statements?

14         MR. HALL:  Your Honor, I'm comfortable with what we

15   have placed in the trial statement, but I can go over it

16   briefly if --

17         THE COURT:  No.  That's okay.  Call your first

18   witness.

19         MR. HALL:  Stacey Rissone.

20         THE COURT:  Ms. Rissone, please step forward and take

21   a seat here.

22           STACEY RISSONE, WITNESS, PREVIOUSLY SWORN

23                       DIRECT EXAMINATION

24   BY MR. HALL:

25   Q    State your name please.

RISSONE - DIRECT

1   A    Stacey Rissone.

2   Q    What is your address?

3   A    3220 Argo Way, Reno, 89509.

4   Q    Tell us briefly about your educational background.

5   A    Grew up in Reno.  Went to Reed High School.  Three years

6   of UNR.

7   Q    And are you married?

8   A    I'm engaged.

9   Q    Have you been previously married?

10  A    Yes.  I was married for 19 years.

11  Q    And do you have children?

12  A    Three children.

13  Q    Okay.  What is your occupation?

14  A    I'm a studio design consultant for KB Home.

15        THE COURT:  I'm sorry, a what?

16        THE WITNESS:  Studio design consultant.

17        THE COURT:  Thank you.

18  BY MR. HALL:

19  Q    And you're the Plaintiff in this action, are you not?

20  A    Yes.

21  Q    How did you meet Mr. Gessin?

22  A    I met him at Silver Peak Grill.

23  Q    And when was that?

24  A    It was in April or May of 2007.

25  Q    And did you become friends?

RISSONE - DIRECT

1   A    Yes.

2   Q    A dating relationship developed?

3   A    A bit.

4           THE COURT:  I'm sorry, a bit?

5           THE WITNESS:  A little dating relationship.  Not --

6           THE COURT:  Okay.

7           THE WITNESS:  -- anything to speak of,

8   BY MR. HALL:

9   Q    How frequently did you see Mr. Gessin during the period

10  from when you met him until July?

11  A    Once or twice a week at the most.

12  Q    Okay.  What kind of a car did he drive?

13  A    I think it was a BMW.

14  Q    A late model?

15  A    Yeah.  But I can't recall.

16  Q    What did he tell you about his business or occupation?

17  A    He said he worked in IT for Lear Medical and that on the

18  side he flipped cars.

19  Q    Does -- did he describe for you in any more detail what he

20  meant by flipping cars?

21  A    That he would buy cars for a low price and sell them at a

22  price and keep the profit.

23  Q    Okay.  Did he tell you about his property holdings?

24  A    He said he owned the mobile home where he lived.

25  Q    Okay.  Did he tell you about his criminal history?

RISSONE - DIRECT

1  A    Yes.  He said he was an ex-felon.  That he went to jail to

2  keep his ex out of jail at the time because she was pregnant,

3  which I found out was false.

4  Q    Okay.  How did he explain what had happened?

5  A    He said it was something -- he said that she had stole

6  credit cards and used them and that he took the fall for her.

7  Q    Okay.  Did you actually observe him flipping cars?

8  A    Only once in person.  He was always looking at cars and

9  talking on the phone to people but I observed it once.

10 Q    Okay.  What did he ask you about yourself?

11 A    Not too much until he started asking me about money.

12 Q    And what was your financial situation at that time?

13 A    I had my money that I received through the divorce in

14 different bank accounts so I had cash on hand.

15 Q    Have you provided us your bank statements --

16 A    Yes.

17 Q    -- in this proceeding?

18        MR. HALL:  Is the exhibit book up there for the

19 witness?  If you look at the exhibit book --

20        THE COURT:  I have it hear.

21 BY MR. HALL:

22 Q    Turn to Tab 1.  Take a moment and look those statements

23 over.  Okay.  Are those full, true and correct copies of the

24 bank statements for your personal accounts during that period

25 of time?

RISSONE - DIRECT

1    A    Yes.

2    Q    And what kind of money do they show you had on deposit at

3    the outset?

4    A    The first bank statement shows that I had deposits and

5    other additions of over $26,000.

6    Q    Okay.  Were there other statements showing additional

7    monies?

8    A    All right.  I'll just get the -- oh, wait.  Maybe that's

9    the second one.

10    Q    Let me just ask it this way.  If we follow through those

11    exhibits, do we find a total of $24,000?

12    A    Yes and then some.

13    Q    All right.  So did you advise Mr. Gessin that you had

14    those kind of funds on hand?

15    A    Yes.  He asked me if I kept -- if I had cash on hand and I

16    told him I did.

17    Q    All right.  What then did he tell you or offer to you

18    about flipping cars?

19    A    That I could make a lot more money flipping cars with him

20    if I invested my money with him instead of in the bank.

21    Q    And did he make any representations to you that if you did

22    so what would happen?

23    A    That I would make a lot of money.

24    Q    Okay.  Would you return -- would your funds be returned to

25    you?

1    A    Yes.

2    Q    With profits?

3    A    Yes.

4    Q    Okay.

5         MS. O'NEILL:  Your Honor, at this point, I'm going to

6    ask that the Court instruct Mr. Hall about leading and pose an

7    objection regarding leading.

8         THE COURT:  Sustained.

9         MR. HALL:  Understood.

10    BY MR. HALL:

11    Q    What did you do then with regard to the representations

12    that Mr. Gessin had made?

13    A    Can you rephrase that?

14    Q    Yes.  What did you do in response to the representations

15    you just described?

16    A    I gave him large amounts of money over a period of two

17    weeks for him to invest into cars and then sell them and return

18    a profit to me.

19    Q    Okay.  And what amount -- what total amount?

20    A    The total was $25,000.

21    Q    And are the withdrawal of those funds reflected in the

22    bank accounts?

23    A    Yes.  24 are reflected.  The other thousand dollars came

24    from a ring that I sold at the Gem Gallery which is -- the day

25    is noted in here.  I sold it and they gave me a check and I

RISSONE - DIRECT/VOIR DIRE

1  cashed that check and got the other thousand dollars from that

2  check.

3  Q    Okay.

4           MR. HALL:  I'd like to move for the admission of

5  Exhibit 1 into evidence, Your Honor.

6           THE COURT:  Objections?

7           MS. O'NEILL:  Your Honor, may I voir dire?

8           THE COURT:  Sure.

9                         VOIR DIRE

10  BY MS. O'NEILL:

11  Q    Ms. Rissone, I've looked through your bank statements and

12  it appears that you -- are you on Tab 1, the first page?  These

13  appear to be customer receipts from Bank of America and they're

14  dated 6/26 -- going from the inside of the page out --

15  6/27/2007, 6/12/2007 and 6/15/2007.  Are these what you purport

16  to say that reflect the actual funds that you withdrew your --

17  from your bank and gave to my client, Mr. Gessin?

18  A    Part of them.  It's just another reflection of what's said

19  -- shown in the bank statements.

20  Q    And are these documents all you have to show that you gave

21  $24,000 to Mr. Gessin?

22  A    Yes.

23  Q    And --

24           THE COURT:  That's going a little bit beyond voir

25  dire.

1  BY MS. O'NEILL:

2  Q    Did -- did you receive these funds in cash?

3  A    Yes.

4  Q    It indicates on the statement electronic withdrawal.  How

5  did that happen?

6  A    That's what it says on the statement.  I don't think you

7  can take $5,000 out of a ATM.

8  Q    That's what I was wondering.

9  A    Yeah.  That's what it says --

10  Q    Why does the --

11  A    -- on the statement.

12  Q    -- why does the statement say electronic withdrawal?  Did

13  you go --

14  A    You'd have to ask the bank.

15        MR. HALL:  Your Honor, this is beyond voir dire.

16        MS. O'NEILL:  Okay.

17        THE COURT:  Yeah, that is.  You can -- you can --

18  she's testified that these reflect the money she took out --

19        MS. O'NEILL:  Okay.

20        THE COURT:  -- correct?

21        MS. O'NEILL:  Well, I have a question as to the

22  voracity of the document, Your Honor, and that's why --

23        THE COURT:  And --

24        MS. O'NEILL:  -- what voir dire is about.  It's --

25  she's -- she's indicating that she -- it -- she took cash out

1    and the receipts that we have here say electronic withdrawal

2    and I don't believe banks allow that kind of electronic

3    withdrawal unless she can give me some reason for the

4    allowance.  If she has some situation with her bank where she's

5    allowed to take $8- to $10,000 out of an ATM, it would be an

6    unusual situation.  I believe that I am entitled to an answer.

7            THE COURT:  Well, I think she just said that you

8    can't take that kind of money out of an ATM.

9            MS. O'NEILL:  Yet her receipt says electronic

10   withdrawal.

11           THE COURT:  But she didn't prepare the receipt.  The

12   bank did.

13           MS. O'NEILL:  She's offering it into evidence to

14   support her claim that my -- that she received money, Your

15   Honor.

16           THE COURT:  I understand that.

17   BY MS. O'NEILL:

18   Q    And Exhibit 1 is a number of documents, would you concur,

19   Ms. Rissone?

20   A    Yes.

21   Q    I'm going to ask you a question about -- and they

22   aren't --

23           THE COURT:  They're not numbered so counting --

24   BY MS. O'NEILL:

25   Q    They're not numbered, but I saw one in here which purports

RISSONE - VOIR DIRE

1    to be --

2              THE COURT:  Find the document first and then direct

3    everybody to it please.

4              MS. O'NEILL:  I'm -- yeah.  I'm looking for it now,

5    Your Honor, and I intend to do that if I can.

6         (Counsel reviews documents)

7              MS. O'NEILL:  Ah.  Let's see.  It's on -- it's a Bank

8    of America statement, Advantage statement, page 3 of 9, Your

9    Honor.  It's about in the middle of the documentations.  The

10   statement period says 6/14 through 7/13/2007.

11   BY MS. O'NEILL:

12   Q    Have you found that yet, Ms. Rissone?

13   A    Yes.

14   Q    Okay.  And that has -- it appears to be some hand writing

15   on that bank statement?

16   A    Yes.

17   Q    And it says -- and -- are these -- first, are these

18   markings yours?

19   A    Yes.

20   Q    All right.  And I see a little -- looks like a half of a

21   parenthesis by the term "Gem Gallery, Inc., Gem Gallery of Reno

22   purchase."

23   A    Yes.

24   Q    Okay.  And does this purchase reflect the fact that you

25   made a purchase at the Gem Gallery?

RISSONE - VOIR DIRE

1  A    Yes.

2  Q    Okay.  And, however, you have written on the document

3  "sold ring and made small purchase, cashed a check from ring

4  and used as part of cash, gave to John."  Are there any other

5  documents to reflect that or is this it?

6  A    That's it.

7  Q    So basically, what you're saying is the Gem Gallery

8  purchase is something we're suppose to impute that you got

9  money from the Gem Gallery?

10 A    I sold a ring.  That was part of the -- that was the

11 thousand dollars that I gave as part of the $25,000.  The other

12 24 are reflected in the statements.

13 Q    Uh-huh.  And the Gem Gallery didn't give you a receipt for

14 the ring or a cash -- or a check that you could provide a copy

15 of the check to us?

16 A    They gave me a check and I cashed it.

17 Q    And you didn't attempt to go back to your bank and get a

18 copy of that check?

19 A    Not two years later.

20 Q    So the answer is no?

21 A    No.

22        MS. O'NEILL:  Your Honor, I'm going to interpose an

23 objection as to the validity of the documents as -- to support

24 what the witness is saying.  I understand the Court has the

25 authority to give it whatever weight's attributed based upon

RISSONE - DIRECT

1   her representations.

2              THE COURT:  Mr. Hall?

3              MR. HALL:  Yes.  We -- her testimony supports that

4   these are the bank statements that reflect the cash that she

5   withdrew and gave to Mr. Gessin.

6              THE COURT:  Your objection's overruled.  They're

7   admitted.

8       (Exhibit 1 Received)

9              DIRECT EXAMINATION (RESUMED)

10  BY MR. HALL:

11  Q    And your testimony here is, first, that you withdrew

12  24,000 and then you sold the ring for a thousand.  What did you

13  do with that money?

14  A    I gave it to John Gessin.

15  Q    For?

16  A    As an investment to buy cars which he would sell and give

17  me the profit and return my $25,000 to me.

18  Q    Why in cash?

19  A    He demanded that it was in cash because he said people

20  were watching him and after him.  That the IRS was watching him

21  because of something he had done in his past.

22  Q    And what did Mr. Gessin say he would do with the money?

23  A    He said he would invest it in cars which he would turn

24  around and sell at a profit.  I would get the profit and then I

25  would get my money back.

RISSONE - DIRECT

1  Q    And what did Mr. Gessin tell you about the mobile home

2  where he was living?

3  A    That he owned it.

4  Q    Was he doing something in particular with it?

5  A    He was -- I guess he was putting it on the market to sell

6  it --

7         MS. O'NEILL:  I'm going to object --

8         THE WITNESS:  -- because then he moved out.

9         MS. O'NEILL:  -- to any guessing, Your Honor.

10         MR. HALL:  Yeah.  I'll withdraw it, Your Honor.

11         THE WITNESS:  Okay.

12         MR. HALL:  I'm sorry.

13         THE COURT:  Okay.  Thank you.

14  BY MR. HALL:

15  Q    After Mr. Gessin received the $25,000, what happened with

16  regard to the dating relationship?

17  A    It stopped about a week or two later.

18  Q    Okay.

19         THE COURT:  Let me ask you this.  How long had you

20  known him when you gave the money to him?

21         THE WITNESS:  About two and a half weeks.

22         THE COURT:  Okay.

23  BY MR. HALL:

24  Q    Since that point in time, have you asked Mr. Gessin about

25  the money?

RISSONE - DIRECT

1   A    On many occasions.

2   Q    And what did he tell you?

3   A    He told me that it was in the bank and that the IRS had

4   frozen his assets.

5   Q    Okay.  Did you and Mr. Gessin communicate by text

6   messaging process called the IM?

7   A    Yes.

8   Q    And did you do that on a regular basis during this period

9   of time?

10  A    Yes.

11  Q    I'd like to direct your attention to Exhibit 3 in the

12  binder.

13          MS. O'NEILL:  Your Honor, I have a pending motion

14  relative to text messages, and I'd like the -- hear the -- or

15  at least argue the motion in limine prior to any testimony

16  relative to the instant messaging.

17          THE COURT:  Okay.  Your -- your testimony -- go ahead

18  and -- I thought you were objecting to the admission of

19  comments on a parole report.

20          MS. O'NEILL:  Your Honor, there are three items in my

21  motion in limine.  The first two -- the first is an alleged CR

22  which would be a criminal information from 2003.  The second is

23  a parole report.  And the third are comments made through

24  instant or test messaging that --

25          THE COURT:  Well, let -- let me ask you this.  You --

1   is it my understanding her testimony is your client admitted

2   that he had been convicted of a felony, correct?

3           MS. O'NEILL:  That's correct, Your Honor.

4           THE COURT:  And he spent time in prison for that?

5           MS. O'NEILL:  Yes, Your Honor.

6           THE COURT:  And that was a fraud related felony, is

7   that correct?

8           MS. O'NEILL:  I believe so, Your Honor.

9           THE COURT:  Okay.

10          MS. O'NEILL:  I have not seen the actual criminal

11  complaint.

12          THE COURT:  Okay.

13          MS. O'NEILL:  I -- may have been a credit card

14  situation.

15          THE COURT:  Okay.  Then I don't know why the various

16  underlying criminal reports would be relevant because the

17  relevance is he's a convicted felon and it was a fraud felony.

18  I don't know that the others are relevant.  Unless he provided

19  them to Ms. Rissone in which case they would be -- could be

20  admissions.  If it was information she provided to him -- I'm

21  sorry -- he provided to her.  I misspoke.

22          MR. HALL:  Understood, Your Honor.  I was not going

23  to offer those at this point.  So I'm just dealing --

24  looking --

25          THE COURT:  Well, if you're not going to offer them,

```
 1    let's not discuss them.

 2              MR. HALL:  Yeah.  Okay.  I was just trying to address

 3    the text.

 4              THE COURT:  Where is the text message?

 5              MR. HALL:  Exhibit 3.

 6              THE COURT:  Where in Exhibit 3?

 7              MS. O'NEILL:  Your Honor, at the bottom of the

 8    document, it says Exhibit 5.

 9              THE COURT:  Correct.

10              MS. O'NEILL:  It was obviously attached to some other

11    doc -- to some other document.  I am objecting to this.  As the

12    Court will see later in the Defense testimony, there are -- we

13    have several situations involving forgery in this matter, and I

14    believe that there are no -- there's no authentication to this

15    document.  There's no dates indicated.  I -- you know, at the

16    bottom of the document, I see a printout that says 2009.  So I

17    don't know when these documents -- or have -- whether or not

18    there is actually -- there's nothing to authenticate this

19    document and it's certainly self-serving.

20              THE COURT:  Well, it's self-serving instead of an

21    objection.  Why would you introduce something that wasn't

22    serving your purposes.

23              MS. O'NEILL:  Right.

24              THE COURT:  So -- but --

25              MS. O'NEILL:  All right.  Well, it's -- I don't
```

RISSONE - DIRECT

1  believe that there is any ability for anyone to authenticate

2  this document as to --

3           THE COURT:  She can authenticate it by saying it's a

4  true and correct copy of a printout that was made of a -- is

5  this text messaging, is that what this is?

6           MR. HALL:  Yes.

7           THE COURT:  Of text messaging that she was involved

8  in.  That would authenticate it.  You certainly can

9  challenge that, but that would be what's necessary to

10 authenticate it.

11          MR. HALL:  That goes to foundation I was trying to

12 lay, Your Honor.

13          THE COURT:  Go ahead.

14 BY MR. HALL:

15 Q   And I believe I asked you, during this period of time, the

16 summer of 2007 and continuing on since that period of time,

17 have you frequently text messaged using this IM service with

18 Mr. Gessin?

19 A   Yes.

20 Q   And you recognize his call sign, if we can call it that?

21 A   Yes.  J.D. Gessin.

22 Q   And is this a full, true and correct copy of the message

23 you received on the date indicated there, September 29th of

24 2009?

25 A   Yes.

RISSONE - DIRECT

1  Q    And the subject matter was a subject matter that only you

2  and Mr. Gessin would've been familiar with, is it -- oh, I'm

3  sorry.

4  A    Yes.

5  Q    And was --

6         MS. O'NEILL:  Your Honor, again --

7         MR. HALL:  -- was the subject --

8         THE COURT:  So --

9         MS. O'NEILL:  -- matter an issue that you and Mr.

10  Gessin had been discussing?

11        THE WITNESS:  Yes.

12  BY MR. HALL:

13  Q    Okay.

14        MR. HALL:  I'd offer the -- Exhibit 3, Your Honor.

15        THE COURT:  Go ahead.

16        MS. O'NEILL:  Your Honor, and I still will interpose

17  an objection.  There's no indication as to the time frame here.

18        THE COURT:  She testified --

19        MS. O'NEILL:  Whether --

20        THE COURT:  -- testified that it was on September

21  29th, 2009.

22        MS. O'NEILL:  Well, that's when it was printed out,

23  Your Honor.  There's no indication as to when this document

24  actually was create -- when the text messages came.  Often,

25  when a document is printed --

RISSONE - DIRECT

1          THE COURT:  And why -- why does that matter?

2          MS. O'NEILL:  Because I believe that there have been

3    all different kinds of representations in this situation.  So I

4    believe that it, you know -- timing is the relevancy in this

5    situation.  I don't -- I think it's been taken out of context.

6          THE COURT:  Well, you're free to ask her about the

7    context now or later you can recall her.  You're free to

8    challenge her recollection of it.  But I mean for the -- I mean

9    it's been authenticated.  You've indicated you think there is

10   fraud but you certainly haven't established fraud.  I'll go

11   ahead and admit this, but you certainly can challenge it.

12       (Exhibit 3 Received)

13         MS. O'NEILL:  Thank you, Your Honor.

14   BY MR. HALL:

15   Q    Referring now to Exhibit 3, and specifically the second

16   page where the statement is how is the IRS -- or how is IRS

17   anywhere.  What were intending to convey by that language?

18         THE COURT:  Just hang on for a second.

19       (Judge reviews exhibits)

20         THE COURT:  All right.  The second page?  They all

21   say page 1 of 1 so --

22         MR. HALL:  Yes.  Second page in the -- in the exhibit

23   binder the way it's arranged.

24         THE COURT:  Okay.  I want to make sure I understand

25   it.  This is the one where at the very top of the page,

RISSONE - DIRECT

1   Ms. Rissone's email says, "Thank God for family."  Mr. Gessin

2   says, "Yes."  Is that the -- that the page?

3              MR. HALL:  That's correct, Your Honor.

4              THE COURT:  Okay.  And where do I find the

5   discussion?  Okay.

6              MR. HALL:  About the 8th or --

7              THE COURT:  Causing the IRS any worry?

8              MR. HALL:  Yes.

9              THE COURT:  Okay.

10  BY MR. HALL:

11  Q    What were you intending to question by that language?

12  A    I was trying to find out what was going on with the

13  $25,000 of my money that he had that he had told me the IRS had

14  frozen.

15  Q    Tell us in more detail about that.  How soon after you

16  gave Mr. Gessin the money did he make that representation to

17  you?

18  A    I gave it to him --

19             THE COURT:  Which representation?  The one that the

20  IRS has ceased it?

21  BY MR. HALL:

22  Q    About the IRS -- let me just ask it this way.  Shortly

23  after you gave Mr. Gessin the money, did he give you a -- an

24  explanation of what had happened to the money?

25  A    In August of the same year, 2007, he said the IRS had

RISSONE - DIRECT

1   frozen all of his accounts including accounts that were holding

2   my $25,000.

3   Q    Okay.  And is that what you're referencing in this page 2

4   of Exhibit 3?

5   A    Yes.

6   Q    And how was Mr. -- what was Mr. Gessin's response?

7   A    Do you want me to read it on here or --

8   Q    I think the document speaks for itself.

9   A    Uh-huh.

10  Q    What I'm asking is in general terms when that subject

11  matter came up, what would Mr. Gessin's response to your

12  inquiry be?

13  A    First, he would say the same thing that the IRS had frozen

14  the money, and then he would state that all of his life savings

15  were in there, too.  So, you know, he's upset, too, and I

16  shouldn't be so upset.

17  Q    And is that

18          MS. O'NEILL:  Excuse me.  Where is that on the

19  document, Ms. Rissone?

20          MR. HALL:  She wasn't referring to the document.

21          MS. O'NEILL:  Oh.

22          MR. HALL:  She was --

23  BY MR. HALL:

24  Q    Refer now to the document and go to the last entry on that

25  page or the last text on that page.  I guess it'd be three

RISSONE - DIRECT

1  lines up from the bottom.  They intercepted returns.  What did

2  you understand Mr. Gessin to be saying by that?

3  A    I wasn't quite sure what he was saying, but the -- he just

4  kept stating that they had also frozen his accounts.  And when

5  I asked for documentation, he never had any to give me.

6  Q    Okay.  There was a reference there to federal court.  What

7  did he tell you about that?

8  A    He stated on many occasions that he would have to fight

9  but I shouldn't worry because he'll win and he'll get my money

10  back and his money back.

11  Q    Okay.  Incidentally, this text message bears the date of

12  9/29/2009.  Is that the date that the exchange actually

13  occurred?

14  A    Yes.

15  Q    Has Mr. Gessin returned any of your money?

16  A    No.

17  Q    Did you commence an action to recover your money?

18  A    Yes.

19  Q    What preceded your commencement of that action?  In other

20  words, what other circumstances occurred to make you aware that

21  -- or to convince you to commence an action?

22  A    I had looked up online for information about him to see if

23  there were other fraud cases that he had been involved in.  And

24  so continually over the years, I had looked because I knew

25  something was going on with my money.  And one day I looked at

RISSONE - DIRECT

1   the end of this -- 2009 and I found a case with your name on it

2   and Allison Tatiano's (sic) name on it that was a fraud case.

3   Q    So what did you do about that?

4   A    I called you.

5   Q    Okay.  And what did you find out?

6   A    I told you that I think he's done the same thing to this

7   woman that he's done to me, and we set up a meeting and went

8   forward.

9   Q    Okay.  Did you also meet separately with Allison Tatiano?

10  A    No.

11  Q    Had you known Allison prior to this time?

12  A    No.

13  Q    Okay.  All right.  Did there come a time when you met with

14  Allison and a Christina Holman (phonetic)?

15  A    Yes.  On one occasion.

16  Q    One occasion?

17  A    Uh-huh.

18  Q    And where and when did that happen?

19  A    It was after I had filed my case and I -- it was after

20  Allison had gone to court.  So I had met her at her arbitration

21  but we never talked privately.  So it was after we had both

22  filed our cases and that was all done.  Hers was completed and

23  mine was still kind of going back and forth.  And we met at

24  Claim Jumpers for about 45 minutes.

25  Q    Okay.  Was there any plot hatched to --

RISSONE - DIRECT

1   A     No, there wasn't.

2   Q     -- go after Mr. Gessin?

3   A     No.

4   Q     Are you familiar with the state court action?

5          THE COURT:  Which state court action?

6          MS. O'NEILL:  Which court?  Thank you, Your Honor.

7   BY MR. HALL:

8   Q     Your state court action against Mr. Gessin?  Are you

9   generally familiar with how that proceeded?

10  A     Yes.

11  Q     True is it not that it was set for arbitration hearing?

12  A     Yes.

13  Q     And shortly prior to that arbitration hearing, what

14  happened?

15  A     We received documentation that he wanted to settle out of

16  court.

17  Q     And what was the amount?

18  A     $28,000.

19  Q     And how did you understand that to be broken down?

20  A     $25,000 for paying back my money and $3,000 in attorney

21  fees.

22  Q     Have you been paid any amount on that judgment?

23  A     No I have not.

24         MR. HALL:  That's all the questions I have at this

25  time, Your Honor.

 1           THE COURT:  Your witness.

 2           MS. O'NEILL:  Thank you, Your Honor.

 3                      CROSS-EXAMINATION

 4  BY MS. O'NEILL:

 5  Q    Let's back up.  I believe that you testified -- how old

 6  are you, Ms. Rissone?

 7  A    48 today.

 8  Q    Happy birthday.

 9  A    Thank you.

10  Q    Sorry that you have to be here for you birthday.

11  A    Uh-huh.

12  Q    I was here all day yesterday --

13  A    Yeah.

14  Q    -- for my son's birthday --

15  A    Nice.

16  Q    -- or in the office.

17           THE COURT:  Wasn't yesterday Sunday?

18           MS. O'NEILL:  Yes it was, Your Honor.  I was -- I was

19  there all day yesterday.

20           THE COURT:  Okay.

21  BY MS. O'NEILL:

22  Q    Ms. Rissone, at the time you met Mr. Gessin, how old were

23  you?  You said 2007, so it would've been five years ago?

24  A    Uh-huh.  Yeah.

25  Q    So --

RISSONE - CROSS

1   A    So 43.

2   Q    -- so how old would you have been?

3   A    43.

4   Q    43 years old?

5   A    Uh-huh.

6   Q    Are you a mother?

7   A    Yes I am.

8   Q    How old are your children?

9   A    23, 19 and 8.

10  Q    And you indicated that you graduated from Reed High --

11  Reed High School?

12  A    Yes.

13  Q    What year?

14  A    '82.

15  Q    Okay.  And you have three years of college where?

16  A    UNR.

17  Q    All right.  And what did you study?

18  A    Interior design and historic preservation.

19  Q    All right.  Did you have to take the basic classes,

20  undergraduate classes, English, math, whatever their -- the

21  requirements to get into your third year?

22  A    Yes.

23  Q    So you didn't take an associate's degree in just interior

24  design?

25  A    No.

RISSONE - CROSS

1    Q    Did you ever receive a degree?

2    A    No.

3    Q    Okay.  And why didn't you?

4    A    I decided not to finish school.

5    Q    Okay.  When you were in school, did you have good grades?

6    A    Yes.

7    Q    Can you read and write?

8    A    Yes.

9    Q    When were you first married?

10   A    I was married in 1989.

11   Q    At what age?

12   A    I was in my early 20s.

13   Q    All right.  And how long did that marriage last?

14   A    19 years.

15   Q    And who was your husband at that time?

16   A    Dario Rissone.

17   Q    Okay.  And at the end of that 19-year period, were -- how

18   many times were you married to Mr. Rissone?

19   A    Once.

20   Q    Did -- during the course of your marriage, did you

21   accumulate any assets or property?

22   A    Yes.

23   Q    Okay.  Did you accumulate real property?

24   A    Yes.

25   Q    How many real properties?

1   A    At the same time or over our marriage?

2   Q    Over your marriage.

3   A    Four.

4   Q    All right.  And what type of properties were they?

5   A    Single family homes and multifamily residences.

6   Q    All right.  And what did you do with those homes?  Did you

7   hold them as investments, were you landlords?

8   A    Yes.

9   Q    And at the time of your divorce, did you own all of those

10  properties?

11  A    No.  Those were accumulated throughout the marriage and

12  some of them were bought and sold.

13  Q    So you had bought and sold some of the properties?

14  A    Uh-huh.

15  Q    Okay.  So you had been through real estate transactions

16  where documents were signed, contracts were executed, things

17  like that?

18  A    Yes.

19  Q    And as Nevada's a community property state, you would've

20  been required to review those documents and sign of on those

21  contracts --

22  A    Yes.

23  Q    -- correct?

24  A    Uh-huh.

25  Q    Did you have a family lawyer at the time?

RISSONE - CROSS

1    A    At some of the time.

2    Q    And who was that?

3    A    I don't recall.

4    Q    Did you have a lawyer assist you with those transactions,

5    the home purchases, the apartment purchases?  Did you have

6    lawyers help you with that?

7    A    On some of them.

8    Q    Okay.  And do you -- you don't recall who that was?

9    A    No.

10    Q    Okay.  Did you consult an estate planner?  Did you and

11    your husband have an estate plan?

12    A    No.

13    Q    How long had you been divorced from your husband, Dario

14    Rissone, in 2007 when you met Mr. Gessin?

15    A    One year.

16    Q    One year?

17    A    Uh-huh.

18    Q    Who was your divorce attorney?

19    A    I can't recall his name right now.

20    Q    Okay.  Would -- did the divorce go smoothly or would you

21    say it was acrimonious?

22    A    In between.

23    Q    Okay.  Isn't it a fact, Ms. Rissone, that as in many

24    divorces there were some cash settlements in your divorce?

25    A    Splitting of some of the funds?

1  Q    Of assets.

2  A    Yes.

3  Q    You had previously testified on direct examination that

4  you had some cash in your accounts based upon your

5  settlement --

6  A    Uh-huh.

7  Q    -- from your divorce, is that correct?

8  A    Yes.

9  Q    Okay.  And isn't it a fact that at some point in your

10  divorce, your husband went back after you for repayment of some

11  funds, approximately $35,000?

12  A    That was not during our divorce.  That was after the

13  divorce.

14  Q    That's just what I said.

15  A    You --

16  Q    At some point after your divorce, your husband went after

17  -- came after you seeking additional funds, is that correct?

18  A    Yes.

19  Q    Okay.  And was the amount $35,000 approximately correct?

20  A    Yes.

21  Q    Okay.  And did you ever pay your husband that money?

22  A    No.  The judge declared that it was not owed to him.

23  Q    Did you discuss your problems -- your post-divorce

24  problems with Mr. Gessin?

25  A    Not that I recall.

RISSONE - CROSS

1  Q    And you don't recall ever telling Mr. Gessin that you had

2  to pull money out of your bank account to hide from your

3  husband because he was coming after you for those funds?

4  A    No.  He -- this was after.  This was just last year when

5  my husband came after me.  This with Mr. Gessin was in 2007.

6  Q    So --

7           THE COURT:  So -- just a second.  When did your

8  husband come after you for money?

9           THE WITNESS:  Last year.

10           THE COURT:  2011?

11           THE WITNESS:  Yes.

12  BY MS. O'NEILL:

13  Q    And was that based upon a marital obligation that you owed

14  from your divorce?

15  A    No.

16  Q    Were you required -- weren't you court-ordered to take

17  your husband off certain properties and cash him out as a

18  condition of the settlement?

19  A    We had a three year time period that we both had to

20  refinance our homes and take each other off the loan.  Neither

21  of us did because we were both upside down on our homes and we

22  could not refinance.  We both tried and we were denied, and I

23  had documentation supporting that which the judge looked at and

24  deemed it relevant and through out the case.

25  Q    Okay.  And what documentation support that -- your

RISSONE - CROSS

1  position did you have?

2  A    I had letters from a mortgage lender and letters from real

3  estate agents that I had gone in and tried to refinance.

4  Q    Okay.  Had you been dating regularly after your divorce

5  and before you met Mr. Gessin?

6  A    I had dated one person prior to John.

7  Q    And for how long?

8  A    For 11 months.

9  Q    Did you give him any money?

10  A    No.

11  Q    Okay.  So how did you meet Mr. Gessin?

12  A    At Silver Peak Restaurant.

13  Q    Okay.  It's a bar and restaurant, correct?

14  A    Yes.

15  Q    And had -- was he somebody that you'd known previous to

16  your meeting him for the first time?

17  A    No.  That's when I met him for the first time.

18  Q    Okay.  All right.  And how did it go about?  Did you meet,

19  have a couple of drinks, exchange numbers?

20  A    I was with my brother and sister-in-law and he approached

21  us.

22  Q    And then did you exchange telephone numbers or email

23  addresses?  How did you -- how --

24  A    I don't really recall that evening, that whole evening.

25  It was quite some time ago.

RISSONE - CROSS

1   Q    Okay.  Had you been drinking?

2   A    I'd been drinking.

3   Q    And how much after that initial encounter did -- did you

4   and Mr. Gessin meet?

5   A    I don't understand the question.

6   Q    What was the next -- when was your next meeting after your

7   initial encounter?

8   A    I don't recall exactly.  Maybe we --

9   Q    Days, weeks, months?

10  A    Probably days.  Four or five days.

11  Q    And where did you meet -- five days?

12  A    Four or five days.

13  Q    Okay.  And where did you next meet?

14  A    I believe it was at his mobile home.

15  Q    You went to his mobile home?

16  A    I believe that's where we met.

17  Q    And do you know where that was located?

18  A    It was up off of Setro (phonetic).

19  Q    Okay.  Was it in the day or the night?

20  A    I believe it was in the day.

21  Q    And what was the occasion?

22  A    Just getting together talking.

23  Q    Okay.  And at that time, did Mr. Gessin advise you or

24  inform you that he was an ex-felon?

25  A    I don't believe it was that day.

RISSONE - CROSS

1   Q    Okay.  But some time before you gave him the money, you

2   knew that he was a convicted felon?

3   A    I can't recall exactly when he told me he was an ex-felon

4   if it was before or after.

5   Q    Tell me what kind of car did you drive?

6   A    When I met him, I had a Honda Element which I still own.

7   Q    Okay.  And did you take anybody with you when you went to

8   Mr. Gessin's home the first time?

9   A    No.

10  Q    Okay.  How long was that meeting?

11  A    I don't recall.

12  Q    Were you intimate?

13  A    We -- I don't recall if we were that day.

14  Q    Okay.  When did you get together again?

15  A    I don't recall exactly the date that we got together

16  again.  Maybe the next week.

17  Q    Okay.  And what was that occasion?

18  A    I don't recall.

19  Q    Was it in his home or was it in your home?

20  A    I don't recall.  A couple times we met at little places to

21  eat, eateries.  So I don't recall where we met which occasion.

22  Q    Okay.  Did you -- did you ever have him in your home?

23  A    Not at that time period that I recall.

24  Q    Well, you dated -- your -- you testified when the judge

25  asked you a question how -- basically how long you knew him

RISSONE - CROSS

1    before you gave him the money and it was two and a half weeks.

2    A    Uh-huh.

3    Q    In that two and a half weeks before you gave him the

4    money, had he ever been to your home?

5    A    Not that I recall.

6    Q    Were you working at this time?

7    A    I owned a staging business.  My own business.

8    Q    So the answer is you were working from home?

9    A    Yes.

10   Q    Okay.  And what is staging?

11   A    Home staging is preparing homes for sale.

12   Q    And how does one do that?

13   A    There is many different ways to do that.  Sometimes you go

14   in and revise the home.  Sometimes you do a consultation with

15   the homebuyer and give them a report.

16   Q    So you go into homes that are for sale and make them

17   presentable?

18   A    Yes.

19   Q    Is that a fair analysis?

20   A    Yes.

21   Q    And did it -- did that require you to work every single

22   day?

23   A    No.

24   Q    Okay.  So you had a lot of free time?

25   A    No.

RISSONE - CROSS

1    Q    Okay.  Did you have some free time?

2    A    A bit.

3    Q    Okay.  Are you computer literate?

4    A    Yes.

5    Q    Do you use a computer in your work?

6    A    Yes.

7    Q    Do you have -- did you work for KB Homes at that time?

8    A    No.  Not when I first met him.

9    Q    Okay.  Have you ever -- had you ever Googled a person?

10   You know what the term "Googling" means?

11   A    Yes.

12   Q    Had you ever Googled anyone?

13   A    Yes.

14   Q    Okay.  Had you ever -- do you -- are you a member of

15   Facebook?

16   A    I am now.

17   Q    Okay.  Were you then?

18   A    No.

19   Q    Okay.  How many years in 2007 had you lived in the

20   Reno/Sparks community?

21   A    31 years.  Yes.

22   Q    Okay.

23   A    Or, I'm sorry, 36 years.

24   Q    36 years?

25            THE COURT:  Is it as of today or as of the time of

RISSONE - CROSS

1    the meeting?

2              THE WITNESS:  As of the time of the meeting.

3    BY MS. O'NEILL:

4    Q     And do you have any friends -- what does your husband --

5    what did your husband do for a living?

6    A     He's in the Air National Guard.

7    Q     All right.  And is that a full time position or is that --

8    does he have another job as well?

9    A     Full time.

10   Q     Full time?  So he's a -- is he an officer?

11   A     Yes.

12   Q     Okay.  And you have adult children?

13   A     Yes.

14   Q     Do they work?

15   A     They're in college and they work.

16   Q     And what do they do for -- what are they studying and what

17   do they do for a living?

18             THE COURT:  What's the relevance of this?

19             MS. O'NEILL:  Your Honor, I'm going to show that she

20   had access to opportunities to do some background investigation

21   on Mr. Gessin and did -- did nothing.

22             THE COURT:  I don't think it's reasonable to ask your

23   children to do background investigation.  You can move off that

24   portion of it.

25             MS. O'NEILL:  All right.

RISSONE - CROSS

1    BY MS. O'NEILL:

2    Q    Do you have any friends in law enforcement?

3    A    No.

4    Q    Do you have any friends who are lawyers?

5    A    No.

6    Q    Does your husband know any lawyers in the Air National

7    Guard?

8    A    I'm sure he does.

9    Q    Are you on good terms with your ex-husband?

10   A    Not the best.

11   Q    In 2007, were you on better or worse terms with your ex-

12   husband?

13   A    Probably the same as I am now.

14   Q    Okay.  You testified on direct examination, Ms. Rissone,

15   that you once witnessed Mr. Gessin flip a car.  Would you

16   describe that is and what you saw?

17   A    He took my money.  We drove to Sacramento.  He purchased a

18   car from a private owner.  It was a red Mazda RX7 I believe.

19   He gave them cash and they gave him the title.  And he said he

20   was going to bring it back to Reno and sell it for a profit and

21   I would get the profit.

22   Q    All right.  And did you keep any -- did you keep -- keep

23   copies of the title and bill of sale and things like that to

24   evince -- the fact that you were part of -- a partner in this

25   -- this transaction?

RISSONE - CROSS

1   A    No.

2   Q    And why was that?

3   A    He kept all the documents.  I didn't have any of the

4   documents.

5   Q    And how much money did you give him for that transaction?

6   A    That was part of the $25,000 that I had already given him.

7   Q    So that would've been one of these documents that's

8   reflected in Exhibit 1.  Which one was it?

9   A    By the time he bought the RX7, he had $25,000 of my money.

10  It was -- he had the entire sum.  So he took seven of it or six

11  of it or whatever it was and bought the car.

12  Q    So he actually went through with one of the transactions

13  that you invested in --

14  A    No.  He --

15  Q    -- and you were a witness, correct?

16  A    No.  He didn't go through it.  He bought the car but he

17  never gave me the profit.

18  Q    Okay.  But he said he flipped cars and he bought a car and

19  you witnessed the transaction?

20  A    He bought the car but he didn't flip it.

21  Q    Okay.  What did -- what -- what became of the car then?

22  A    He was driving it for some time.

23  Q    Was it ever registered in his name?

24  A    I don't know.

25  Q    Is some time more than ten days?

RISSONE - CROSS

1    A    Yes.  It was months that he drove that car.

2    Q    And do you have any proof?  Do you have a photograph of

3    him in the car, pictures of the car, anything along those

4    lines?

5    A    No.

6    Q    When did this transaction -- when did this transaction

7    allegedly occur in Sacramento?

8    A    I believe in the end of June, the beginning of July of

9    2007.

10   Q    Okay.  And at -- at some -- at that point, you had given

11   him $25,000.  He bought a car for, you say, $6- or $7,000, am I

12   correct?

13   A    Yes.  Something like that.

14   Q    Okay.  You were there, right?

15   A    Yes.

16   Q    So you saw the exchange?

17   A    Yes.

18   Q    Did you ever have the title -- did you ask that the title

19   be put in your name?

20   A    No.  That wasn't part of the deal.  He would flip the car

21   and he would give me the profit.

22   Q    And did you have -- did you say, well, I'm going to need

23   the money back in ten days, 30 days?

24   A    I pressed him for money.

25   Q    No.  Initially, when you made the investment, did you --

RISSONE - CROSS

1    did you have an agreement how -- how long you would wait for a

2    return on your investment?

3    A    I don't recall.

4    Q    And is there a reason -- could you explain to us why there

5    was no written contract?

6    A    No.

7    Q    You -- you were an instant messenger.  Did you instant

8    message or text or write out in any form your agreement with

9    Mr. Gessin?

10   A    I wasn't an instant messenger.  I only started instant

11   messaging with John Gessin because he would instant message me.

12   So I had never instant messaged prior to meeting him.

13   Q    Okay.

14            THE COURT:  That wasn't the question.

15            THE WITNESS:  Okay.

16            THE COURT:  Did you ever write out the contract or

17   email him or instant message him about the agreement?

18            THE WITNESS:  We talked about the agreement on

19   instant messaging but I don't have printouts of those.

20   BY MS. O'NEILL:

21   Q    Really?

22   A    Yes, really.

23   Q    And did you feel that you just -- you didn't need a

24   contract relative -- or did you ever get a receipt from

25   Mr. Gessin relative to the receipt of the money?

RISSONE - CROSS

1    A    No.

2    Q    How was the money given to him?

3    A    In cash.

4    Q    So can you walk us through please?  And I'm again

5    referring to Exhibit 1.  Let's go with the earliest date, June

6    the 12th, 2007.  Which Bank of America do you frequent, do you

7    participate in, do -- are you a member?

8    A    I'm not a member of any Bank of America at this time.

9    This was back in 2007 when I was.

10   Q    All right.  And where was the bank located?

11   A    There was many Bank of Americas in town and I frequented

12   more than one.

13   Q    Okay.  So on June the 12th, which Bank of America did you

14   go to?  It's the first page, Ms. Rissone.  And I don't mean to

15   be tricky.  Yeah.  I'm looking at the --

16   A    Oh.  You're looking at the receipts.

17   Q    -- I'm looking at the customer receipt --

18            THE COURT:  Looking at the middle receipt.

19            MS. O'NEILL:  -- in the middle --

20            THE WITNESS:  Okay.

21            MS. O'NEILL:  -- of document 1, and that one is

22   Transaction 0080.  The time is -- looks to be 2:08 in the

23   afternoon.

24            THE WITNESS:  Uh-huh.

25   ///

RISSONE - CROSS

1   BY MS. O'NEILL:

2   Q    You took $4,000.

3   A    I don't recall the location the of the bank.

4   Q    Okay.  Do you often take out $4,000 cash withdrawals from

5   banks?

6   A    No.

7   Q    How did you do it?  Did you go into the bank?

8   A    Yes.

9   Q    Okay.  Did you write a check for it?

10  A    No.  I filled out a withdrawal form.

11  Q    So you -- did you have a checking -- was this a checking

12  account?

13  A    I don't recall.  I had a couple different accounts with

14  them.  This looks like it was my checking account.

15  Q    So what withdrawal form would you have filled out at Bank

16  of America?

17  A    It was either from my checkbook or withdrawal form from

18  the bank.

19  Q    Well, from you checkbook would be a check, right?  You

20  said you either have at least in --

21  A    Yeah.  That's true.  So --

22  Q    -- my practice so --

23  A    Yeah.

24  Q    I see you have checks and deposit slips.

25  A    Yes.

RISSONE - CROSS

1    Q    Did you have something else?

2    A    No.  It would be a withdrawal form from the bank.

3    Q    Okay.  And what kind of withdrawal form did you execute?

4    A    A withdrawal form from the bank.

5    Q    So it wasn't a check?

6    A    I believe it was with -- my memory is that it was a

7    withdrawal form from the bank.  It was quite some time ago.

8    Q    What does a withdrawal form look like?  I'm sorry.  I

9    don't know and I don't mean to harass you but --

10   A    Just like a deposit form but it says withdrawal at the

11   top.

12   Q    And why $4,000?

13   A    I don't recall.

14   Q    Okay.  Did you -- have you ever gone back to Bank of

15   America and gotten a copy of that withdrawal form?

16   A    Of this one?

17   Q    No.  This is a receipt that you --

18   A    Right.

19   Q    -- got cash.

20   A    I believe they didn't have copies of the withdrawal forms

21   that you could get as far as I know.

22   Q    Really?

23          THE COURT:  Her question was did you go back?

24          THE WITNESS:  No.

25   ///

1   BY MS. O'NEILL:

2   Q    So you never sought to verify the fact that you filled out

3   a document requesting cash on that day other than this receipt

4   for -- that you've presented?  No other document?

5   A    My account statements have the documentation in it also.

6   Q    And then kind of walk us through that day.  That June --

7   June 12th, 2007 day.  2:00 in the afternoon, you get $4,000

8   from your bank.  What do you do with it?  Where do you go?

9   A    I have no recollection of that day five years ago.

10  Q    How many other people have you given $4,000 cash to?

11  A    Nobody.

12  Q    So you have -- okay.  If you don't have any recollection

13  of that day, can you walk us through how you -- how you

14  received -- did you receive the money in cash?

15  A    Yes.

16  Q    What kind of cash was it, 20s, hundreds, thousands?

17  A    I think it was hundreds.

18  Q    Okay.  Was it in an envelope?

19  A    Yes.

20  Q    And what did you do with the envelope?

21  A    At what point?

22  Q    Did you put it in your purse?

23  A    I'm sure I did.

24  Q    Did you give to John Gessin the same day?

25  A    I don't recall.

RISSONE - CROSS

1   Q     Would you have given it to John Gessin within a short

2   period of time?  It looks like the withdrawals were all pretty

3   closely related.

4   A     Yeah.  I would've given it to him in a short amount of

5   time.

6   Q     And is the short amount of time within hours or days?

7   A     Probably days.  I don't recall.

8   Q     Where did you give him the money?

9   A     We met somewhere so I gave it to him when we were at our

10  cars but I don't recall where.

11          THE COURT:  You were out of your cars you said?

12          THE WITNESS:  Yes.

13  BY MS. O'NEILL:

14  Q     So you were standing by your cars and you just handed him

15  the envelope with $4,000 in it?

16  A     It was in a box, actually.

17  Q     It was in a box?

18  A     Yes.

19  Q     Okay.  Describe the box please.

20  A     A small shoe box.

21  Q     And was that your idea?

22  A     No.

23  Q     Tell us how the shoe box came into play please.

24  A     I don't recall.  It was John Gessin's idea.

25  Q     Was it just the $4,000?

RISSONE - CROSS

1   A    I don't recall.  I gave him certain amount of money within

2   a two-week period, and I don't recall if that was just the

3   4,000 or if it was more.

4   Q    Okay.  Would you tell me -- how big was the shoe box?  Was

5   it a lady's shoe box?

6   A    Lady's or child's.  I can't remember.

7   Q    Okay.  Did -- did the $4,000 fill up the shoe box?

8   A    I don't recall if it was only $4,000 or if it was more

9   like I said.

10  Q    Did the money inside the box fill up the box?

11  A    I don't believe it did.

12  Q    Then how was it secured?  Did you tape it closed?

13  A    I don't recall.

14  Q    And while you were looking for a shoe box to put the money

15  in, did it ever occur to you that you might want to draft up a

16  receipt or some -- some kind of written document evincing that

17  you were going to give money to John and he was going to give

18  money to John and he was going to give money back to you?

19  A    I don't recall what I was thinking that day.

20  Q    Anytime --

21  A    That was five years ago.

22  Q    -- before you gave the money to him?  You don't recall

23  what you were thinking?

24  A    (No verbal response)

25  Q    You have to answer out loud.  I'm sorry.

1   A    I don't recall.

2   Q    Did -- before when you started talking about how -- well,

3   let me back up and refocus here.

4            THE COURT:  Ms. O'Neill, I think you've made your

5   point.  I think you can sit down with this -- with this line of

6   questioning.  I've got -- I've got the picture.

7            MS. O'NEILL:  I think I have just a couple more

8   questions, Your Honor.

9            THE COURT:  Okay.

10           MS. O'NEILL:  And I'm sorry to do this because she --

11           THE COURT:  Go ahead.

12           MS. O'NEILL:  -- obviously is the key witness here.

13           THE COURT:  Go ahead, but very few.

14  BY MS. O'NEILL:

15  Q    Ms. Rissone, have -- what other kind of investments have

16  you have been involved with as an adult?

17  A    Many investments.

18  Q    Would you list them please?

19  A    I probably can't recall all of them.  We've had rental

20  properties.  I've had CDs, stocks, bank accounts.

21  Q    And on each of those occasions when you put money into

22  whatever, a piece of property -- we've already established --

23  A    Uh-huh.

24  Q    -- that you had to sign documents.  When you gave money to

25  the bank to establish a CD, did you request a written document

RISSONE - CROSS

1   back?  Did you receive a written document back?

2   A    Sometimes.  Sometimes no.

3   Q    But the bank had the CD.  You had some evidence that the

4   bank had the CD, correct?

5   A    Yes.

6   Q    Okay.  Do you have any evidence that John Gessin ever

7   received the money?

8   A    My IMs.  But he had my money.

9   Q    Well, that's interesting.  Your IMs.  Your instant

10  messaging?

11  A    Uh-huh.

12         THE COURT:  And that would be Exhibit 3, is that

13  correct?

14         THE WITNESS:  Yes.

15  BY MS. O'NEILL:

16  Q    So two years later, you are instant messaging Mr. Gessin.

17  Now, are these the only instant messages that you have relative

18  to your funds?

19  A    Yes because I was new to instant messaging with him.  I

20  didn't know you could print them out and I didn't know that

21  they did not save automatically in your computer so that you

22  could print them out later.

23  Q    Okay.  Where in your instant messages -- and go ahead and

24  take a good look.  Where in the here is -- where is the -- in

25  the hell is my money, John Gessin?  Or I gave you $25,000 to

RISSONE - CROSS

1   flip cars.  Where is it?  Or I'm going to file a police report,

2   John Gessin, because you took my money.  Did you do that?

3          MR. HALL:  Compound objection, Your Honor.

4          MS. O'NEILL:  I'll break them up.  Thanks.  He's

5   right.  I can --

6   BY MS. O'NEILL:

7   Q    Did you ever file a police report?

8   A    Yes I did.

9   Q    Do you have a copy of it?

10  A    Not with me.

11  Q    And did the police take any action?

12  A    At the time, I don't recall what action they exactly took.

13  Q    Okay.  But you didn't think it was appropriate or

14  necessary to give Mr. Hall a copy of your police report?

15  A    I don't recall if I did or did not.

16  Q    In your instant messages, there's no reference to $25,000

17  that I've seen.  Do you see it?

18  A    There's reference to money.

19  Q    Right.  Any reference to $25,000?

20  A    No.

21  Q    Any reference to car flipping?

22  A    I don't know.  I'd have to read through them.

23  Q    Okay.

24          THE COURT:  Please do so.

25          (Witness Complies)

1          THE WITNESS:  No, because this is after he wasn't

2    flipping cars.

3    BY MS. O'NEILL:

4    Q    Okay.  The answer is just yes or no.

5    A    No.

6    Q    Is there any reference?

7    A    No.  Not that I see.

8    Q    Do you recall speaking with John Gessin about problems he

9    was having with his student loans?

10          MR. HALL:  Relevance, Your Honor.

11          MS. O'NEILL:  I'll get to relevance.  I'm laying some

12   foundation for the question.

13          THE COURT:  Okay.

14          THE WITNESS:  He -- when I asked for documentation

15   from the IRS regarding his accounts being frozen, he gave me

16   some document about a student loan, and I said this has nothing

17   to do with your accounts being frozen.

18   BY MS. O'NEILL:

19   Q    Okay.

20   A    That's all I know.

21   Q    So -- so John Gessin did provide to you documentation that

22   the IRS was in fact taking his internal -- his income taxes

23   based upon student loan obligations?

24   A    No.  That wasn't what he showed me with the student loan.

25   Q    Do you have a copy of it?

RISSONE - CROSS

1   A    No I don't.

2   Q    Did you keep a copy?

3   A    He didn't give me a copy.

4   Q    Did you ask for a copy?

5   A    Yes and he didn't give me a copy.

6   Q    But on -- on the middle page since they're not -- they're

7   all 1 of 1s -- the -- when John Gessin said, "No, they

8   intercepted returns, filed a claim, may have to go to federal

9   court, more aggravation," could've easily have been his

10  problems relative to his students -- student loan as well?

11  A    No.  Absolutely not.

12  Q    Yet he showed you documentation that he was having

13  problems with the IRS relative to his student loans, correct?

14  A    No.  It was in relevance to his student loan.  It had

15  nothing to do with the IRS.

16  Q    I'm going to also show you -- go to the third page.  And

17  this doesn't say 1 of 1.  It just has the date of 2009.  The

18  very last text, do you see where it says -- you know, and it's

19  the very last one.  It's interesting.  The font's different.

20  It's -- your tagline as it were, Stacey Rissone at SB -- am I

21  pronouncing your last name correctly, Ms. Rissone?

22  A    Rissone.

23  Q    Rissone.  Thank you.  At SBC Global.  "Yeah.  But the

24  money was all in the bank so it's still safe, correct?"  And

25  then after the -- "Unless you really spent it.  Keep me

1   posted."  That's an entirely different font than the other

2   fonts contained within the text messages.

3           MR. HALL:  Objection.

4           THE WITNESS:  No it's not.

5           MR. HALL:  Counsel is testifying, Your Honor.

6           MS. O'NEILL:  Well --

7           THE WITNESS:  No.  My fonts are all the same in here.

8   When you're IM-ing (sic), each person can have their own font.

9   John Gessin has one font.  I have a different font.

10  BY MS. O'NEILL:

11  Q    Okay.  So you --

12  A    You can do that on instant messaging.

13  Q    So is it -- so is it John Gessin saying "Unless you really

14  spent it.  Keep me posted, okay?"  Or is it you saying that?

15  A    That's the same font as the line up above.

16          THE COURT:  I think it is.

17          THE WITNESS:  It is the same font.

18  BY MR. HALL:

19  Q    And was there any -- any word after that?

20  A    I don't recall.

21  Q    Could you quickly walk me through -- I know that we're

22  running short of time here -- could you tell me about the other

23  two times that you withdrew money from Bank of America please?

24  Do you have any recollection for the other two times that you

25  pulled out large sums of money?  Let's go to June the 15th,

RISSONE - CROSS

1    2007 where it appears that you pulled out twice the amount that

2    you first pulled out $8,000.  Do you recall what bank you went

3    to?

4    A    No.

5    Q    So you -- no, you don't -- you don't --

6    A    It was Bank of America.

7    Q    Okay.  And which -- you don't recall which branch?

8    A    No.

9    Q    And did you go through the same process?  Did you do that

10   withdrawal form that you used at the bank?

11   A    I don't recall.

12   Q    So you don't know if you wrote a check?

13   A    (No verbal response)

14   Q    You have to answer out loud.  I'm sorry.

15   A    I don't recall.

16   Q    Okay.  And did you get $8,000 in cash?

17   A    Yes.  If that's what the amount was that I took out that

18   day, yes, it was in cash.

19   Q    All right.  And would you walk us through what you did

20   with that money?

21   A    I don't recall specifically what I did with that money at

22   what time.  I gave it to John Gessin within those -- that two

23   week period.  I gave him the total of $25,000 in three or four

24   meetings.

25   Q    And why did you break it up?

1   A    Because I had to move money around to get it available in

2   cash from different accounts.

3   Q    And do you have transaction documentation relative to

4   that?

5   A    It shows in the account statements that I transferred

6   money from different accounts in the account statements.

7   Q    Okay.  Now, let me be clear, Ms. Rissone, have -- have you

8   given $8,000 in cash to any other person?

9   A    No.

10  Q    And did this second time, did you -- did it ever occur to

11  you to get a receipt?

12  A    No.

13  Q    And was this $8,000 comingled in that same shoe box with

14  the first $4,000?

15  A    I said I don't recall.

16  Q    Did you ever have any inkling that this might be kind of

17  dangerous, financially imprudent?

18  A    Afterwards.

19  Q    How much afterwards?

20  A    When he told me that it was frozen by the IRS and he

21  wouldn't talk to me anymore.

22  Q    Let's go to the June 26th, 2007.  In that situation, it

23  appears that you pulled out an unusual amount, $5,243.  Why

24  that amount?

25  A    I don't recall.

RISSONE - CROSS

1   Q    Did you get that all in cash?

2   A    I -- as far as I remember, yes.

3   Q    Did you use the same method as you've testified previously

4   using the withdrawal form?

5   A    I don't recall.

6   Q    Did you go back through it at -- before -- at the time in

7   2007, were you receiving printed banks -- copies of your checks

8   from Bank of America?

9   A    No.

10  Q    Why not?

11  A    Because I wasn't.

12  Q    Okay.

13  A    I think they stopped doing that years ago as far as I

14  remember.

15  Q    Okay.  Did you ever go back to Bank of America and ask for

16  a copy of that -- that withdrawal slip?

17  A    I did and they didn't have them anymore by the time I

18  asked.

19  Q    And when was that?

20  A    A couple years ago.

21  Q    Okay.  So that would've -- we're talking now about a

22  five-year period --

23  A    Yeah.

24  Q    -- correct?  So you would've -- it would've been three

25  years after --

RISSONE - CROSS

1  A    Uh-huh.

2  Q    -- the fact?  I'm sorry.  You have to answer out loud.

3  A    Yes.

4  Q    Did you ever send John Gessin a letter or have a lawyer

5  send him a letter saying, hey, pal, you -- we -- we're involved

6  in an investment situation together, I gave you 20 -- well,

7  $15- or $25,000?  This totals -- eight and four and 12 -- this

8  is 17,290.

9  A    That's not the total I gave John Gessin.

10  Q    Okay.  What else -- and you gave -- you've testified that

11  you sold some ring to Gem -- to --

12  A    I gave him a total of $25,000 to invest for me.

13  Q    Okay.  Where -- where is the proof of the other funds?

14  A    The 24 are in these documents.  The one -- other thousand

15  dollars came from the ring.

16  Q    Okay.  So the three documents I see on this front page --

17  A    They're in the account statements.

18  Q    Okay.  Well, I -- let's walk through it.  The three here

19  are $17,290.43.

20  A    Uh-huh.

21  Q    Would you agree to that?

22  A    Yes.

23  Q    Okay.  Now, was that -- is this all the money that was in

24  the shoe box?

25  A    No.  I told you gave I gave it to him in four different

RISSONE - CROSS

1  occasions and I don't recall how much money I gave to him each

2  time, but it was a total of $25,000.

3  Q   Well, let's back up then.  Perhaps it's my memory.  I

4  believed that you -- I interpreted you -- what your testimony

5  was is that you combined the withdrawals into --

6        THE COURT:  I don't think what your testimony (sic).

7        MS. O'NEILL:  Okay.

8        THE COURT:  Move on.  Off the -- we're off the shoe

9  box.  Go onto something else.

10       MS. O'NEILL:  Well, Your Honor, I -- I am unclear

11  about this.

12       THE COURT:  She said that she gave him money on four

13  occasions.  She said she put the first one -- she didn't think

14  it contained any other monies and she didn't think the other

15  ones contained any other monies.  I'm clear on it.  That's what

16  counts.

17       MS. O'NEILL:  I -- well, I'm sorry.  I'm not clear.

18  BY MS. O'NEILL:

19  Q   Did all three transactions here end up in the same shoe

20  box?

21  A   No.

22  Q   Okay.  All right.  But you testified earlier that when you

23  put the $4,000 in the shoe box, you thought there was other

24  money with it, correct?

25  A   Yes.  But I don't recall how I split the money up.

RISSONE - CROSS

1  Q    Okay.

2  A    It was a total of $25,000.

3  Q    So all of the 25 wasn't in the shoe box?

4  A    At one time.

5  Q    Okay.

6         MS. O'NEILL:  Thank you, Your Honor, for letting

7  me --

8         THE COURT:  Sure.

9         MS. O'NEILL:  -- go into that.

10 BY MS. O'NEILL:

11 Q    Can we go through your bank statement and see exactly the

12 timing of when you pulled out the other funds and the amounts?

13 I have on a -- an Advantage statement, page 6 of 7, appears to

14 be the cash withdrawal that -- and that seems to reflect that

15 same $4,000 that you took on June the 12th, do you --

16 A    Yes.

17 Q    -- agree with me on that?  Can you find the others?

18 A    Yes.

19 Q    Okay.

20         THE COURT:  So we're on 6 of 7, is that correct?

21         MS. O'NEILL:  Yes, Your Honor.

22         THE COURT:  And where is the $4,000 figure?

23         MS. O'NEILL:  It would be at the very top, Your

24 Honor.

25         THE COURT:  Oh, I see it.

RISSONE - CROSS

1          MS. O'NEILL:  I have a mark.

2          THE COURT:  Like a --

3          MS. O'NEILL:  It looks like kind of a half a

4    parenthesis.  Other subtractions continued.  There appears to

5    be a dot by the date 6/12.

6    BY MS. O'NEILL:

7    Q    Does -- it looks here like you took it from Bank of

8    America at Plumb and McCarran.  Does that refresh your

9    recollection?

10   A    That's probably where I took it from.

11   Q    Is that close to your home?

12   A    It's within a couple miles --

13   Q    Okay.

14   A    -- as are other banks.

15   Q    Is that the bank that you normally bank at?

16   A    I normally banked at a couple banks but that was one of

17   them.

18   Q    Okay.  So I'm going past the Gem Gallery document that

19   we've already spoken about.  It looks like on another page 6 of

20   9 on statement 6/14/2007 through 7/13/2007 -- under other

21   subtractions -- do you find that, Ms. Rissone?

22   A    Yes.  Those are the other three withdrawals.

23   Q    Well, the 52 -- five two nine zero forty-three taken on

24   June 26th is reflected on that first page, correct?

25   A    Yes.  But the $4,000 and these three withdrawals equal

**AVTranz**
www.avtranz.com · (800) 257-0885

RISSONE - CROSS

1    over $24,000.

2    Q    And you took out -- it appears that you took out on the

3    same day $7,000 and $8,000.

4    A    Yes.

5    Q    And it looks like you took them -- took it out from two

6    different branches.  Why would that have been?

7    A    I don't recall.

8    Q    You just testified earlier that you had to move money

9    around.

10   A    I don't recall why I took it out of two different

11   branches.

12   Q    On the same day, you don't recall?

13   A    I don't recall --

14   Q    Okay.

15   A    -- why I took it out of two different branches.

16   Q    So this $15,000 that you took out on the same day, tell us

17   how that came about.  Did you get cash again?

18   A    Yes.

19   Q    Were they hundreds?

20   A    I believe so.

21   Q    Were those the -- were those the hundreds that were in the

22   shoe box?

23   A    I gave him a total of $25,000 in about three or four

24   transactions and everything was given to him in the shoe box in

25   I believe hundred dollar bills.

RISSONE - CROSS

1   Q    Okay.  So now I'm confused because -- at least the -- my

2   understanding of the Court's interpretation is that some of the

3   funds were in a shoe box and some were given in another

4   situation.

5         MS. O'NEILL:  Did you -- did Your Honor --

6         THE WITNESS:  No.  I gave it to him --

7         MS. O'NEILL:  -- are you and I on the same page, Your

8   Honor?

9         THE COURT:  My understanding was they used a shoe box

10  more than once.

11        MS. O'NEILL:  Oh.  Thank you.

12  BY MS. O'NEILL:

13  Q    So is that -- is that correct, Ms. Rissone?

14  A    Yes.

15  Q    Was it the same shoe box?

16  A    I don't recall.

17  Q    So this --

18        THE COURT:  We're going to take -- we -- we're going

19  to have to go into recess here.  I have another matter which

20  we're going to here in about a minute.  So --

21        MS. O'NEILL:  Thank you, Your Honor.

22        THE COURT:  -- why don't you guys take a short break.

23  You're instructed not to discuss the testimony that's going on

24  with the other witnesses.  We'll be in recess for ten minutes.

25        THE CLERK:  All rise.

1        (Recess)

2              THE COURT:  Please be seated.  Ms. Rissone, please

3    retake the stand.  You're still under oath.

4              Counsel, please go ahead.

5              MS. O'NEILL:  Thank you, Your Honor.

6    BY MS. O'NEILL:

7    Q    Ms. Rissone, have -- have you added up these amounts that

8    you -- you claim that Mr. Gessin owes you 20 -- $25,000.  Why

9    is it an even amount.

10   A    Excuse me?

11   Q    Why is the amount that you're alleging that Mr. -- well,

12   you say 28,000 -- but you indicate that you -- that you loaned

13   Mr. Gessin $25,000?

14   A    Yes.

15   Q    You took money out in an uneven amount.  One of these

16   withdrawals -- the $5,290.43 is an uneven amount.

17   A    I don't recall why it was an uneven amount but I gave him

18   $25,000 total.

19   Q    So there's no change in the shoe box?

20   A    Excuse me?

21   Q    There was no change, pennies, nickels, dimes --

22   A    No.

23   Q    -- quarter?  No?  You testified that you never received

24   any money from John Gessin.  Isn't it a fact that he loaned you

25   $250 in 2008 to make a car payment?

RISSONE - CROSS

1  A    No.  And I never said I never received any money from him.

2  I said I never got any of my money back of my original $25,000.

3  Q    What money did you receive from John Gessin?

4  A    He gave me a check for a couple hundred dollars.  I don't

5  recall the exact amount and he said it was proceeds from

6  flipping a car.

7  Q    Do you have that writing (sic)?

8  A    No I don't.

9  Q    Do you have a copy of the check?

10 A    No I don't.

11 Q    You also testified under oath earlier that you had never

12 loaned anyone a large sum of money save and except John Gessin.

13 Isn't it a fact that during this period of time that you loaned

14 a nephew approximately $6,000?

15 A    I gave a nephew $6,000 and that wasn't at one time.

16 Q    Oh.

17 A    It was small amounts over a period of about five years.

18 Q    And -- oh.  Over five years?

19 A    It was a period of about five years that I gave him money

20 and it wasn't $6,000 at one time.

21 Q    Was it -- was it -- how was that transmitted?

22 A    I don't recall.  Probably checks.  Paying bills for him.

23 Q    I'm sorry.  Paying bills for him?

24 A    Checks or paying bills for him.  It was in small amounts.

25         MS. O'NEILL:  Your Honor, could the court clerk or

1    someone show Ms. Rissone how to move the microphone because I

2    think she's having to lean into the mic.  Thank you.

3              THE WITNESS:  I think I can move it.

4              MS. O'NEILL:  Okay.  Thank you.

5    BY MS. O'NEILL:

6    Q    So you would've paid your nephew or the money that you

7    gave him in checks?

8    A    That -- it wasn't a large amount of money that I loaned my

9    nephew and it was small amounts at different times.

10   Q    Is it reflected on any of these bank statements?

11   A    No.  It wasn't in the same time period.

12   Q    At some point, your counsel asked you if you knew or if

13   you were involved in any kind of a conspiracy with Allison

14   Tatiano.  Isn't it a fact that you were listed as a witness on

15   Allison Tatiano's arbitration hearing?

16   A    Yes.

17   Q    And so that would've been -- she would've known about you

18   and the facts of your case before her arbitration, correct?

19   A    Yes.

20   Q    Had you spoken with her before the arbitration?

21   A    No.  I had spoken to Glade Hall.

22   Q    Okay.  And how about Christina Ho?  Do you know Christina

23   Ho?

24   A    Yes.

25   Q    Okay.  And when did you meet Christina Ho?

 1  A    Just the one time that I already told you about.

 2  Q    At the Claim Jumper?

 3  A    Yes.

 4  Q    And who did you know Christina Ho to be?

 5  A    John's ex.  Mother of his child.

 6  Q    Have you stayed in contact with Christina Ho?

 7  A    I see her at court hearings like today.

 8  Q    Okay.  Other times?

 9  A    No.

10  Q    Do you -- are you friends on facebook?

11  A    No.

12  Q    Do you instant message with her?

13  A    No.

14  Q    Do you communicate by telephone?

15  A    No.

16  Q    Have you ever been a -- listed as a witness in any court

17  hearing on behalf of Ms. Ho?

18  A    No.

19  Q    Now, when -- your counsel asked you about your -- the

20  lawsuit, you contacted -- it's your testimony I believe that

21  you looked online, saw that someone else was suing John Gessin,

22  contacted Mr. Hall, told him your story, and he agreed to

23  represent you.  Is that --

24  A    Not at that time.  He agreed to let me come in and talk to

25  him.

RISSONE - CROSS

1  Q    Okay.  Did you pay him for representation?

2  A    No.

3  Q    Is he -- so he's doing this for free?

4  A    No.

5  Q    Did someone else pay him to represent you?

6  A    No.  I have not given Mr. Hall any money but he's not

7  doing it for free.

8  Q    What's your arrangement with Mr. Hall?

9  A    I don't recall exactly.  It's a percentage.

10  Q    Percentage of what?

11  A    I -- of, you know -- he -- well, we got $28,000.  He gets

12  three of that.  It's for the attorney.  That's what we have

13  right now.

14  Q    Okay.  And how about for this proceeding?

15  A    I don't have any particular dealings with this proceeding

16  as far as money with Mr. Hall.

17  Q    So you don't have a written retainer agreement with Mr.

18  Hall relative --

19  A    Yes.  I have a written retainer.  I don't have it in front

20  of me.

21  Q    Okay.  So you don't know what he's charging you for this

22  hearing?

23  A    He's charging me a percentage of something but I don't

24  recall because I don't have the information in front of me.

25  Q    So it's your belief that Mr. Hall is going to get a

RISSONE - CROSS

1    percentage of anything he collects out of this adversarial

2    proceeding?

3    A    I'm sorry?

4    Q    Sorry.  I'm using a technical term --

5    A    Yeah.  You --

6    Q    -- and I apologize --

7    A    Uh-huh.

8    Q    -- for that.  I hate when lawyers do that --

9    A    Uh-huh.

10   Q    -- and I'm -- I'll spank myself later.  The -- I'm unclear

11   about your arrangement with Mr. Hall.  Is it my -- is it your

12   understanding that Mr. Hall will get a percentage of whatever

13   comes out of this hearing?

14   A    No.

15   Q    Would you explain what you understand it to be?

16   A    No.  When -- when I first hired him, it was a percentage.

17   But then I got a settlement.  So it was the settlement that we

18   settled on.

19   Q    Okay.

20            THE COURT:  Oh.

21   BY MS. O'NEILL:

22   Q    All right.  And that -- this -- that settlement -- and I'm

23   going to talk to you about that.

24   A    Uh-huh.

25   Q    I have that in my hand.  We're going to talk about that in

RISSONE - CROSS

1   a second.  But that's already -- that's passed.  So Mr. Gessin

2   then filed bankruptcy and you filed -- now, this is a new

3   action, would you agree with that this --

4   A    Yes.

5   Q    Okay.  And do you have a new agreement with Mr. Hall?

6   A    I have just the original agreement.

7   Q    And do you know how much Mr. Hall is going to get paid for

8   this?

9   A    No.

10          MS. O'NEILL:  Your Honor, I believe that this -- the

11   next document I'm going to talk to the witness about is -- has

12   Exhibits 6 -- no -- I think it's 16.  It came in -- let me

13   confirm that.  I have a witness list here -- sorry -- an

14   exhibit list.

15      (Counsel Reviews Documents)

16          MS. O'NEILL:  I'm sorry.  It -- Your Honor, it's 25,

17   26.

18          THE COURT:  25 and 26?

19          MS. O'NEILL:  Yes, Your Honor.

20          THE COURT:  Okay.

21          MS. O'NEILL:  Initially, I found the document 25 and

22   then I found parts -- additional parts to it so I provided

23   those to Mr. Hall.  And they are Mr. Hall's documents so I

24   don't believe that there's any prejudice to offering it.  May I

25   have it -- you -- how would you prefer to proceed, Your Honor?

1    Would you like me to mark this document?

2            THE COURT:  No.  I have a binder that's got it, but

3    does she have a copy?

4            Do you have a copy?

5            THE WITNESS:  Huh-uh.

6            THE COURT:  Mark it and give her a copy please.

7        (Counsel Complies)

8            MS. O'NEILL:  Your Honor, the back portion, if you

9    remove that, are (sic) the proof that this transmittal was to

10   Mr. Hall.  And he has agreed.

11           THE WITNESS:  Thank you.

12           THE COURT:  So it's an offer of judgment and a

13   judgment.

14           MS. O'NEILL:  There should be an acceptance of the

15   offer of judgment.  An offer of judgment, an acceptance of the

16   offer of judgment and the judgment, Your Honor.

17           THE COURT:  I have an offer of judgment as Exhibit

18   25.

19           MS. O'NEILL:  And then there should be a packet with

20   everything together, Your Honor.

21           THE COURT:  And Exhibit 26 is a judgment.

22           MS. O'NEILL:  And then if you look behind that, Your

23   Honor, you'll see Exhibit 1.

24           THE COURT:  And Exhibit 1 to the judgment is an

25   acceptance of offer of judgment.

RISSONE - CROSS

1              MS. O'NEILL:  And then you should be -- and Exhibit 1

2    would be the original offer of judgment.  So it's a packet,

3    Your Honor.

4              THE COURT:  Okay.

5              MS. O'NEILL:  Do you have everything there, Your

6    Honor?

7              THE COURT:  Yes.

8    BY MS. O'NEILL:

9    Q    I'm going to ask you, Ms. Rissone to start with --

10   actually, with the back of the document and work forward.  Now,

11   the last page of the document is -- the last -- the last

12   document is called an offer of judgment.

13   A    Uh-huh.

14   Q    And do you see at the top it was from your lawyer,

15   Mr. Hall?  I'm looking up here.

16   A    Yes.

17   Q    Okay.  And do you understand what an offer of judgment is?

18   A    Yes.

19   Q    All right.  That was explained to you by your lawyer?

20   A    Yes.

21   Q    Okay.  And it was to Mr. Gessin and his attorney at the

22   time, correct?

23   A    Yes.

24   Q    All right.  And would you please --

25              MS. O'NEILL:  Your Honor, I'd offer the packet,

RISSONE - CROSS

1   Exhibit 26 into evidence.

2           THE COURT:  Mr. Hall?

3           MR. HALL:  May I have just one moment, Your Honor?

4           THE COURT:  Sure.

5           MR. HALL:  I didn't see all the pages.

6       (Counsel Reviews Documents)

7           MR. HALL:  Somehow I'm missing the last page.

8           MS. O'NEILL:  Okay.  Let's see.

9       (Counsel Confer)

10          MS. O'NEILL:  Your Honor, do you have the very last

11  page signed by Mr. Hall because I'm not sure if that was

12  transmitted.  I'm --

13          THE COURT:  All right.  Going from the back, I have

14  Gess (sic) 156 which is an offer of judgment which is just a

15  single page document and does not appear to have a signature

16  page from Mr. Hall.  I have 155 which was an exhibit number.  I

17  have 154 which is an index to exhibits which says offer of

18  judgment.  I have acceptance of offer of judgment signed by

19  Casey Baker.  And then I have a certificate of service sending

20  the acceptance.

21          MS. O'NEILL:  Your Honor, for the record, I would

22  like -- direct the Court's attention, it may -- this may have

23  been a copying error.  The Court can look to Exhibit 25 which

24  has -- is basically the offer of judgment and that has the last

25  page signed by Mr. Hall.  And --

RISSONE - CROSS

1            THE COURT:  So I will admit Exhibit 25 and 26.

2        (Exhibits 25 and 26 Received)

3            MR. HALL:  Yes, that's fine.  No objection, Your

4    Honor.

5            THE COURT:  Okay.

6            MS. O'NEILL:  Thank you.

7            THE COURT:  Those are admitted.

8            MS. O'NEILL:  And, Your Honor, may I approach the

9    witness --

10           THE COURT:  Sure.

11           MS. O'NEILL:  -- and give her that last page --

12    her --

13           THE COURT:  You're giving her --

14           MR. HALL:  Actually, those --

15           THE COURT:  -- the offer of judgment, is that

16    correct?

17           MS. O'NEILL:  I'm giving her the -- actually, the

18    last page of 26 --

19           THE COURT:  Oh, sure.  Go ahead.

20           MS. O'NEILL:  -- which is the signed --

21           MR. HALL:  Those are I my exhibit book as well, Your

22    Honor, so she has those there in front of her if --

23           THE COURT:  You have the exhibit?  What -- what

24    exhibits are they?

25           MR. HALL:  We have the offer of judgment as 7.

1    Notice of acceptance of offer as Exhibit 8.

2              THE COURT:  So if you'll look at Exhibit 7 -- so I

3    will admit the offer of judgment --

4              MS. O'NEILL:  Thank you, Your Honor.

5              THE COURT:  -- which is -- which is Exhibit -- just

6    because they're in the same book -- Exhibit 7 in Mr. Hall's

7    book, Exhibit 8 which is the notice of acceptance of offer of

8    judgment which is Number 8 in Mr. Hall's exhibit book -- and

9    then that includes -- someplace in here there's a judgment I'm

10   assuming.

11             MS. O'NEILL:  Yeah.  And that's on 26, Your Honor.

12             THE COURT:  And I will admit Defendant's Exhibit 26

13   which contains the judgment based on the offer of judgment.

14   BY MS. O'NEILL:

15   Q    Do you see those documents, Ms. Rissone?

16   A    Yes.

17   Q    Okay.

18             THE COURT:  And which one are we looking at?

19             MS. O'NEILL:  I'm actually refer- -- direct her

20   attention to the document called -- entitled "offer of

21   judgment."

22   BY MS. O'NEILL:

23   Q    Now, on direct examination, Ms. Rissone, you testified --

24   direct examination is when you were -- asked -- answering

25   questions from your lawyer -- you stated, "We received

1   documents that he wanted to settle out of court."  Do you

2   recall saying that?

3   A    Today?

4   Q    Yes.  In the trial today.

5   A    Yes.

6   Q    Okay.  And isn't it a fact that you transmitted documents

7   to Mr. Gessin that you wanted to settle out of court?  Did --

8   A    I --

9   Q    -- do you understand that that's what the offer of

10  judgment means?

11  A    I did not transmit them myself.

12  Q    Right.  Your lawyer did --

13  A    Uh-huh.

14  Q    -- right, on your behalf, would you agree there?

15  A    Yes.

16  Q    Okay.  Is your -- your name's on the caption, right --

17  A    Yeah.

18  Q    -- Stacey Rissone, yes?

19  A    Yes.

20  Q    The caption is this part up here?

21  A    Yes.  I see.

22  Q    On line 9 and 10?

23  A    Yes.  I said yes.

24  Q    Okay.  Thank you.  All right.  And I'm going to direct

25  your attention now to lines 25 and 26.  They're kind of 25 and

1   a half, 26 and a half.  Would you read out loud what that says?

2   A    On which one?

3            MR. HALL:  Your Honor, the document speaks for

4   itself.

5            THE COURT:  The document speaks for itself and it's

6   clear that the offer of judgment does not constitute admission

7   of liability but the judgment does.

8            MS. O'NEILL:  Okay.  I want to ask her what she

9   understands it to me, though.

10            THE COURT:  Why does that matter what she understands

11   the offer of judgment means?  It's a legal document.  Move on.

12   BY MS. O'NEILL:

13   Q    When you were talking to Christina Ho, did you ask her any

14   information or to confirm any information that you received

15   from Mr. Gessin originally?

16   A    Not that I recall.

17   Q    So how were you able to learn that -- what Mr. Gessin told

18   you about taking a fall from -- from his ex was untrue?

19   A    I don't recall.  But it was not from her.

20   Q    So did you independently try to corroborate anything about

21   his criminal history?

22   A    I believe I looked online at court documents.  I don't

23   recall what specific information I found online.

24   Q    Okay.  And when would this have been?

25   A    I don't recall.

RISSONE - CROSS

1  Q    Was it when you were dating Mr. Gessin?

2  A    No.  It was after.

3  Q    But you're fairly confident that at the time you were

4  dating him you knew he was an ex-felon?

5  A    Excuse me?

6  Q    You're confident that you knew at the time you were dating

7  him that he was an ex-felon?  He explained that --

8  A    I was confident that I knew?

9  Q    You -- did you know?

10 A    I don't recall exactly when he told me he was an ex-felon.

11 Q    But he did tell you?

12 A    At one point, he did.

13 Q    All right.  And did you ever -- after the two and a half

14 weeks that you dated and you gave him this -- these amounts of

15 money that you've testified to, did you ever resume your

16 relationship?

17 A    At one point, we became friendly again.  I was trying to

18 get back in contact with him to kind of get information on my

19 money.

20 Q    And when was that?

21 A    I don't recall exactly.  Maybe the next year.

22 Q    2008?

23 A    Prob- -- possibly.

24 Q    Okay.  And thereafter in 2008 or 2009, do you recall John

25 Gessin giving you the $250?

RISSONE - CROSS

1    A    He gave me the $200 or $250 within the first couple of

2    months after I gave him the money --

3    Q    Okay.

4    A    -- not a year later.

5    Q    Okay.

6    A    As far as I recall.

7    Q    Okay.  Do you know whatever happened to that red car that

8    you bought in -- that you -- he -- you and he bought in

9    Sacramento?

10   A    No I don't.

11   Q    So you never followed up with DMV to find out if that was

12   -- that car was ever sold?

13   A    I didn't have information to follow up with DMV.  No I did

14   not.

15   Q    So you didn't have the VIN number or the make and model,

16   anything like that?

17   A    No.

18   Q    Did you buy it from a private party?

19   A    I didn't buy it.  He bought it with my money.

20   Q    Okay.  But you were present, right?

21   A    Yes.

22   Q    Okay.  Was it from -- was the purchase made from a private

23   party?

24   A    Yes.

25   Q    Did you ever have occasion to contact that person again to

RISSONE - CROSS

1  find out what he knew or get any information about the car?

2  A    I didn't have his information.

3  Q    Did you go to the person's house?

4  A    It was in Sacramento.

5  Q    That's not my question.

6  A    I did not go to the house.

7  Q    Okay.  Where was the purchase made of the car?

8  A    At the person's house in --

9          MR. HALL:  Your Honor, relevance.

10          THE WITNESS:  -- I went to the person's house -- I

11  guess it was his house -- outside at the time of the purchase

12  but not afterwards.

13  BY MS. O'NEILL:

14  Q    Okay.  Okay.  So you knew -- you knew about where the

15  person lived.  You had an address where you had been before.

16  A    I did not have an address.

17  Q    Okay.  So in essence, you didn't make any attempts to

18  follow up on the purchase of the -- or purchase or sale of the

19  red car?

20  A    I had no information.

21  Q    Okay.  How long have you worked for KB Homes?

22  A    Five years.

23  Q    How close after this incident -- because this incident

24  occurred approximately five years ago -- did you go to work for

25  KB Homes?

1   A    I started training in the middle of July --

2   Q    All right.

3   A    -- of 2007.

4   Q    So would it have been just during the time you were dating

5   John Gessin?

6   A    It was right at the time we had ended our relationship.

7   Q    Okay.  Was that end of your relationship acrimonious?

8   A    Yes.

9   Q    Okay.  Do you know that if John Gessin started dating

10  someone else?

11  A    No.

12  Q    Okay.  Did you see him with his child?  Did you ever meet

13  his child?

14  A    Yes.

15  Q    Okay.  Did the child appear to live with him?

16  A    Part of the time.

17           MR. HALL:  Your Honor, objection.  Relevance.

18           MS. O'NEILL:  Just --

19           THE COURT:  What's the relevance?

20           MS. O'NEILL:  I'm trying to confirm that she went to

21  his home so -- and I'll --

22           THE COURT:  She's already testified she went to his

23  home.

24  BY MS. O'NEILL:

25  Q    Was there -- did you ever go to Mr. Gessin's residence

RISSONE - REDIRECT

1   when he was renting a room from someone?

2   A    Yes.

3   Q    Okay.  And do you know the name of the person from whom he

4   was renting?

5   A    No.

6   Q    Okay.  How soon after you gave him the money was that?

7   A    I don't recall.

8   Q    Weeks or -- days, weeks or months?

9   A    It was very soon after but I don't recall.

10  Q    Did you ever find it strange that if he had told you that

11  he was -- that he owned a mobile home that he was now renting a

12  room from someone?

13  A    He said that he was trying to sell it.

14  Q    Sell the mobile home?

15  A    Yes.

16         MS. O'NEILL:  That's all the questions I have.  Thank

17  you, Your Honor, for your patience.

18         THE COURT:  Any redirect?

19         MR. HALL:  Just a few questions, Your Honor.

20         THE COURT:  Go ahead please.

21                      REDIRECT EXAMINATION

22  BY MR. HALL:

23  Q    Ms. Rissone, you said that after a certain time after the

24  breakup I guess it was that Mr. Gessin wouldn't talk to you.

25  What did you mean by that?

RISSONE - RECROSS

1  A    He wouldn't answer phone calls.  He wouldn't answer my

2  IMs.  He was very mysterious and vague.

3        THE COURT:  How could you tell if he was mysterious

4  and vague if he wouldn't answer your IMs or your phone calls?

5        THE WITNESS:  Well, it just seemed mysterious because

6  you could see -- on IM you can see that he's online but that he

7  wouldn't answer his IM.  With IM, if they see your IM, he's --

8  he must -- you feel like he's ignoring it.

9  BY MR. HALL:

10 Q    Is there a process where a person can block you from

11 communicating with them on IM?

12 A    Yes.

13 Q    And did Mr. Gessin block you?

14 A    Yes.  On certain occasions he did.

15       MR. HALL:  That's all the questions I have, Your

16 Honor.

17       THE COURT:  Any recross?

18                    RECROSS-EXAMINATION

19 BY MS. O'NEILL:

20 Q    Do you have any proof of any of those blocks?

21 A    No.

22 Q    But at some point, it looks like he opened the line of

23 communications back because you have recent IMs, correct?

24 A    Recent IMs of 2009.

25 Q    Right.



RISSONE - RECROSS

1    A    Uh-huh.

2    Q    But at some point, he allowed you back in and you began

3    communicating again, correct?

4    A    And then he blocked me again.

5    Q    Okay.  And do you have -- you didn't print off anything

6    that said this message is blocked?

7    A    No.

8    Q    Okay.

9         THE COURT:  Well, in Exhibit 3, you say on page 1 of

10   1, "Hey there, boy, are you friggin' (sic) hiding from me?

11   Why?  You block me whenever you get on line.  Boo-hoo."  So you

12   did make a reference.

13        THE WITNESS:  Well, I guess I do have something.

14   Yeah.  I did make reference to it.

15   BY MS. O'NEILL:

16   Q    Okay.

17   A    Thank you.

18   Q    But he answered those, correct?

19        THE COURT:  He answered that one.

20        THE WITNESS:  He answered that one.

21   BY MS. O'NEILL:

22   Q    Okay.

23        THE COURT:  Nothing further?

24        MS. O'NEILL:  I'll just ask for the record because --

25   has -- this document's in evidence, correct, Your Honor?

RISSONE - RECROSS

1          THE COURT:  It is.

2          MS. O'NEILL:  Okay.

3    BY MS. O'NEILL:

4    Q    Does it -- doesn't it indicate that Mr. Gessin is having

5    computer problems?  He had to use the library computer and he

6    was limited at time.  Do you see that there?

7          THE COURT:  It doesn't indicate he's having computer

8    problems.  It just says he's using the library computer and he

9    has 30 minutes.

10         MS. O'NEILL:  Okay.

11   BY MS. O'NEILL:

12   Q    Do you see that?

13   A    Yes.

14   Q    Okay.

15         MS. O'NEILL:  That's all the questions I have.

16         MR. HALL:  Nothing --

17         THE COURT:  Is this witness excused?

18         MR. HALL:  -- nothing further.

19         MS. O'NEILL:  She's --

20         THE COURT:  Pardon?

21         MR. HALL:  Nothing further from me.

22         THE COURT:  I didn't hear you.

23         MR. HALL:  I say no questions further from me.

24         THE COURT:  Okay.  Thank you.

25         You're excused.  Thank you.

TAITANO - DIRECT

1          THE WITNESS:  Okay.  Thank you.

2          MR. HALL:  We call Allison Taitano.

3          THE COURT:  You'll need to go get her.

4      (Waiting for Witness)

5          THE COURT:  Ma'am, could you please take the seat up

6   here?

7          MS. TAITANO:  Sure.

8          THE COURT:  And you've been previously sworn?

9          MS. TAITANO:  Yes.

10         THE COURT:  Okay.  Mr. Hall?

11         MR. HALL:  Yes.  Thank you.

12         ALLISON TAITANO, WITNESS, PREVIOUSLY SWORN

13                   DIRECT EXAMINATION

14  BY MR. HALL:

15  Q    State your name please.

16  A    Allison Moore.

17  Q    And were you formerly known as Allison Taitano?

18  A    Correct.  Allison Taitano.

19  Q    And how do you spell that?

20  A    T-A-I-T-A-N-O.

21  Q    And in 2009, did you have occasion to meet one John

22  Gessin?

23  A    Yes.  We met I believe it was January of 2009.

24  Q    How did you meet?

25  A    On the internet through Match.com.

TAITANO - DIRECT

1  Q    And how did the relationship progress once you met?

2  A    It was -- it was quickly.  We went -- the -- a couple days

3  after we started talking online, we met for a drink at the

4  Pepper Mill and we started spending a lot of time together from

5  that point on.

6  Q    As part of your -- the process whereby you met, did you

7  happen to see a profile, a dating profile of Mr. Gessin?

8  A    Yes.  The way Match.com works is you have -- you look at a

9  profile and that's how you find out information about that

10 person.  And so he had a profile online explaining his

11 character and what he was all about.

12 Q    Did -- would you look at the exhibit book in front of you

13 there, Exhibit 3?

14            THE COURT:  What's the relevance of this?

15            MR. HALL:  I'm sorry?

16            THE COURT:  Mr. Hall, how is this relevant?

17            MR. HALL:  I'm sorry, Your Honor.  I can't hear you.

18            THE COURT:  How is this relevant?

19            MR. HALL:  It's part of her story, Your Honor.

20            THE COURT:  Why is her story relevant to this case?

21            MR. HALL:  Prior bad act.

22            THE COURT:  I don't --

23            MR. HALL:  Similar -- similar bad act.  Let me -- let

24 me explain it that way.

25            THE COURT:  Please.  Please stand up to explain it.

1          MR. HALL:  Oh, I'm sorry.  Simply, exactly the same

2   kind of a scam where he has represented to her that he would

3   take her money and invest it wisely and make a return and then

4   deny that he ever received the money.

5          THE COURT:  Well, let me -- let me tell you where I

6   am at this point.  I'm -- I'm satisfied that he made the

7   representations to her.  I'm satisfied that he did it in this

8   case because there's a judgment in this case.  I think the main

9   issue I'm con -- I'm interested in is the reliance of your

10  client which appears to me at this point to not be reasonable.

11  So if you want to shorten this up if that's -- if she's not

12  going to talk about the reasonableness of the reliance, then

13  she doesn't need to testify.

14         MR. HALL:  Just a few questions --

15         THE COURT:  Okay.

16         MR. HALL:  -- with regard to that.

17  BY MR. HALL:

18  Q    When you first met Mr. Gessin, how did he present?  In

19  other words, what did you see?

20  A    He seemed like he was a catch.  He seemed like he had --

21         THE COURT:  He was a catch?

22         THE WITNESS:  A catch.

23         THE COURT:  Okay.

24         THE WITNESS:  To use a technical term.  It seemed

25  like he had a lot to offer.  He, according to his profile, was

1    college educated, had a good job, made a lot of money, you

2    know, seemed like he was -- had it together, you know.  And

3    that's -- when that's all you're going by, you look at a

4    profile and that's what you judge based upon.

5    BY MR. HALL:

6    Q    And so the aura or the image he presented convinced you to

7    give -- invest money with him as well?

8    A    Right.  I mean he -- he definitely said that he was

9    skilled.  I think he -- the -- I think the phrase he used

10   exactly was skilled at making money and making other people

11   money was something he would be willing to do for me if I would

12   be willing to give him my money.

13   Q    And you in fact gave him your money?

14   A    $30,000.  Yes.

15   Q    And it's not been returned to you?

16   A    No.  I have a judgment against him so I've received some

17   but very small.

18   Q    Did the image he presented personally fit the information

19   he gave about his background education in money?

20   A    No.  There were a lot of things that should've been bigger

21   red flags I guess than they were.  But he mentioned on the

22   profile that he had no children when in fact I met his son not

23   long after we started dating.  And then there was always an

24   explanation as to why that wasn't on the profile because I

25   inquired.  Well, you never said you had children.  Well, I

1    wanted to keep that part of my life separate from my child.  He

2    said on his profile that he had a job, yet I never saw him go

3    to work, and that was because he got laid off after he made the

4    profile and he was working to further his education by going to

5    college taking online classes which I never saw a lot of

6    representation of either but I went to work everyday so I

7    didn't know what he did during the day in actuality.  He's said

8    he owned his own home.  Yet when I met the landlady that he was

9    renting a room from, that was odd.  So he just always had

10   explanations as to why what was represented on the profile

11   didn't match reality.

12   Q    And was that generally characteristic of him that he would

13   have explanations for whatever you questioned?

14   A    Absolutely.

15   Q    All right.

16   A    And different explanations for the same question at

17   different times.  I think sometimes it was hard to keep

18   straight on his part.

19          MR. HALL:  That's all the questions I have, Your

20   Honor.

21          THE COURT:  Cross?

22                     CROSS-EXAMINATION

23   BY MS. O'NEILL:

24   Q    Ms. Moore, you got a judgment from an arbitration,

25   correct?

1  A    Correct.

2  Q    And you participated in that arbitration?  You were there?

3  A    Yes.

4  Q    Okay.  Did Mr. Gessin or his attorney present any

5  witnesses?

6  A    There was one I believe, one witness at the arbitration.

7  Q    Who was it?

8  A    Mr. Gene Occhino (phonetic) I believe was there on his

9  behalf.

10 Q    That wasn't his witness.  That was your -- one of your

11 witnesses I believe.

12 A    I believe that was his witness.

13         MR. HALL:  No.

14         THE WITNESS:  I'd have to ask my attorney.  I can't

15 recall.

16         MR. HALL:  It -- it's --

17 BY MS. O'NEILL:

18 Q    And is Mr. Hall your attorney?

19 A    Yes.

20 Q    Okay.

21         MR. HALL:  If she's going to testify, I want to

22 testify.

23         THE COURT:  You asked a question.

24         MS. O'NEILL:  Yeah.

25         THE COURT:  You got an I don't know.

```
 1              MS. O'NEILL:  Yeah.

 2              THE WITNESS:  I honestly don't know.  That was one

 3   person who was there so --

 4              MS. O'NEILL:  Okay.  All right.

 5              THE WITNESS:  I don't know if he was requested --

 6   BY MS. O'NEILL:

 7   Q    Did Mr. -- weren't -- let's see.  Did -- were any

 8   documents presented by Mr. Gessin in the arbitration hearing?

 9   A    Not that I recall.  This was almost two year -- probably

10   over two years ago.  Not that I recall.

11   Q    Is it -- isn't it a fact that the arbitrator was kind of

12   unhappy with Mr. Gessin for not putting on testimony and

13   witnesses?

14              THE COURT:  That calls for speculation --

15              MS. O'NEILL:  Okay.

16              THE COURT:  -- as to the arbiter's state of mind.  If

17   you're unhappy about the arbitration, the statute of

18   limitations on legal malpractice is three years.  You can sue

19   whoever your attorney was.  I don't know who it was.

20              MR. HALL:  Yeah.

21              MS. O'NEILL:  I'm trying to get to the point, Your

22   Honor, and I'll -- maybe I'll just ask it.

23   BY MS. O'NEILL:

24   Q    Was John Gessin able to put forward his side of the story

25   at the arbitration?  Did he do that?
```

1   A      Yes.

2   Q      Okay.  Was everything that you put on your matchbook (sic)

3   profile correct?

4   A      Yes.

5   Q      Okay.  Yet, you -- you discovered as soon as you met Mr.

6   Gessin that there were irregularities to use your term.  There

7   were things that you found odd.

8   A      Correct.

9   Q      That's another one of your term.

10  A      Correct.

11  Q      You knew that he had a child when he said he didn't.

12  A      Uh-huh.

13  Q      It appeared that he didn't have a job.

14  A      Uh-huh.

15  Q      It appeared that he didn't own his own home.  That he was

16  renting from someone, correct?

17  A      Yes.

18  Q      Okay.  And yet within one week of meeting this man who you

19  found all these problems with --

20  A      Uh-huh.

21  Q      -- you gave him $30,000?

22  A      That's because your client is good.

23  Q      Okay.

24  A      He is good at convincing people of stories and fabricating

25  relationships and he's pretty skilled.  So yeah.  Did I make a

```
 1   bad judgment call, something that I'll regret for the rest of
 2   my life?  Yes.  But did he in fact represent himself this way
 3   and was a different way?  Yes.  Did I give him $30,000?  Yes.
 4   Q     And was it in cash?
 5   A     Yes.
 6   Q     Did you get a receipt?
 7   A     No.
 8   Q     What --
 9            THE COURT:  Was it in a shoe box?
10            THE WITNESS:  No.  He actually came to the bank with
11   me to withdraw it.
12   BY MS. O'NEILL:
13   Q     Okay.  Did --
14   A     I think it probably excited him but --
15   Q     What was the investment?
16   A     The investment?  Well, that changed because as I said
17   previously, he'd tell stories to fit the time.  But the
18   original --
19   Q     Well, no.  When you gave him the --
20   A     -- the original investment was he was going to have --
21   take the $30,000 and he was going to invest it in real estate
22   or the stock market, one of the two.  And it cha -- it varied
23   from different.  It was originally going to be the stock market
24   is how he told me he lost the money.  And then when I asked to
25   see stock receipts and I asked what stocks, you know, he could
```

1   $30,000 in in that amount of time, then it changed to being a

2   real estate investment.

3   Q    So you didn't -- were you provided any prospecti,

4   prospectuses (sic) or any kind of documents relative to the --

5   initially when you gave him the money, did he show you any

6   documentations or proof or --

7   A    He had showed me a -- I don't know if it was a website or

8   a -- it was a bank account of some sort that he had $90,000 in

9   that he said he'd earned from a small amount of money by

10  investing in stocks and real estate and that he was going to do

11  that for me.

12  Q    Do you believe in hindsight -- and hindsight's 20/20 --

13  and based upon all you know in this situation, do you believe

14  that your reliance on what he said was reasonable?

15  A    My reliance on what he said at what time?  Everything he

16  said?

17  Q    When you gave him the money?

18  A    Oh, no.

19  Q    Okay.  Thank you.

20          MR. HALL:  Nothing further from me.

21          THE COURT:  This witness is excused.  Any further

22  witnesses?

23          MR. HALL:  No.

24          THE COURT:  Ms. O'Neill?

25          MS. O'NEILL:  Your Honor, may we approach?



1          THE COURT:  Sure.

2        (Side Bar Conference Not Recorded)

3          MR. HALL:  The Plaintiff is resting our case, Your

4    Honor.

5          THE COURT:  Okay.  Ms. O'Neill?

6          MS. O'NEILL:  Your Honor, pursuant to the evidence

7    that's been presented by the Plaintiff in this case and the law

8    as set forth in § 523(a)(2), I believe that the Plaintiff has

9    not met her burden by a preponderance of the evidence relative

10   to the elements that are described in my trial statement and,

11   for that reason, I would make a motion to dismiss the case, and

12   I believe it's pursuant to 41(b).  I've left my Rules of Civil

13   Procedure back at -- in the car.

14         THE COURT:  Well, I'll let you put it -- I'm going to

15   grant the motion, Ms. Rissone.  And the reason is this.  I

16   think you were cheated by this individual, but in order to have

17   the debt determined to be non-dischargeable in this court, you

18   have to establish that you reasonably relied.  And as I heard

19   the testimony, you met this gentleman in a bar, which there's

20   nothing wrong with.  You knew he was a convicted felon.  You

21   knew he'd spent time in prison for a fraud-related kind of

22   activity.  He wanted you to invest in -- he wanted you to

23   invest in flipping cars and there's nothing wrong with flipping

24   cars, but he wanted cash because he was also fighting with the

25   IRS or his ex-wife depending on some of the documents I've

 1  read.  He wanted you to meet and put the cash in a cardboard

 2  box which seems odd to me, and he wanted you to meet him -- I

 3  don't know if it was a dark alley, but meet him someplace that

 4  you don't recall.  I don't -- I know you got cheated.  I don't

 5  -- I don't disagree with that.  I just don't think your

 6  reliance was reasonable.  I understand from other things that

 7  Mr. -- Mr. Gessin is a very persuasive man and you were

 8  persuaded, but you have to -- in order to get relief legally in

 9  most places, you have to have relied in a reasonable fashion.

10  And given what you knew at the time he transferred the money, I

11  just don't think I can find that.

12          So I'm going to grant the motion that was made by the

13  Defendant and the case is going to be dismissed.  I am sorry

14  you were cheated but that happens occasionally and I hope

15  you'll be more careful in the future, and it looks like you're

16  doing fairly well anyway and I'm glad for that.  So that'll be

17  my ruling.  Those are my findings of fact and conclusion of law

18  on the record under 752.  I'd like Ms. O'Neill to prepare an

19  order, run it by -- prepare findings and conclusions and a

20  judgment of dismissal and run it by Mr. Hall for his signature

21  and I'll sign it.

22          MS. O'NEILL:  Thank you, Your Honor.

23          THE COURT:  Anything further on this matter?

24          MR. HALL:  Your Honor, I just note for the record

25  that under 523, there are -- there's more than just fraud that

 1  can be a basis --

 2          THE COURT:  Lists false representations.  There's all

 3  kinds of things.  But the case authority says even with respect

 4  to the other ones you have to reasonably rely.

 5          MR. HALL:  Okay.

 6          THE COURT:  So I do understand that there's fraud,

 7  misrepresentation, all kinds of things and I think --

 8          MR. HALL:  False pretenses.

 9          THE COURT:  -- all of those things were established.

10  False pretenses.

11          MR. HALL:  -- is what I was focused on.

12          THE COURT:  But I still think you have to reasonably

13  rely by case law.

14          MR. HALL:  Okay.

15          THE COURT:  So that's my finding.  Thank you.

16          MR. HALL:  Thank you, Your Honor.

17          MS. O'NEILL:  Thank you, Your Honor.

18          THE WITNESS:  We'll be in recess.

19      (Proceedings Concluded)

20

21      I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.

23  Dated: October 3, 2012        _____
                                    *Laura Hinton*
                                    AVTranz, Inc.
24                                  845 North 3rd Avenue
                                    Phoenix, AZ  85013

25